# RANDALL B. NAYLOR et al. v. DUNCAN McRUER, BOARD OF TRUSTEES OF PARK COLLEGE, and DUNCAN McRUER, Trustee, Appellants.

### Division Two, March 12, 1913.

1. **APPELLATE PRACTICE: Exceptions Not Assigned as Error.** Objections made and exceptions saved to testimony, not assigned as error in the appellant's brief, will not be considered on appeal.

2. **WILL CONTEST: Weight of Evidence.** A contest of a will, under the statute, is an action at law, and the appellate court will not pass upon the credibility of the witnesses and the weight of the evidence, if there is substantial evidence to support the verdict. The court will not hold that a demurrer to the evidence on the issue of undue influence should have been sustained, if there is substantial evidence to support the charge, but the issue is relegated to the jury.

3. ————: **Undue Influence: How Shown: Circumstances and Inference.** The existence of undue influence may be shown by circumstances, as well as direct proof. In the very nature of things, if such influence is exerted it is most likely exercised in secret and not in the light; and for that reason its existence and exercise are not required to be always established by direct and positive proof.

4 .————: ————: **Question for Jury: Misconception of Children: Confidential Relation.** Testator, by a will made a few months prior to his death at the age of sixty-nine years, gave to his widow a life estate in certain town lots and houses with remainder to Park College; and the rest of his estate, which consisted of two farms of five hundred acres and $2000 in money and other certain personal property, he devised to a young man as trustee, to manage, keep in repair, rent and collect the income; authorizing him to keep an oversight of the affairs of his wife and pay her during life one dollar a day and such further part of the income as she might need in case of misfortune; to pay to Park College two thousand dollars out of the personalty, or, if it proved not sufficient, out of the income of the farms; and to divide annually the net balance of the income equally between his son and daughter, during their lives, and upon the death of the survivor to turn over the *corpus* to their heirs *per capita*. The scrivener of the will was the lawyer and friend of the testator and Park College and had been for years. He had been the college's trustee, legal adviser and business manager, had solicited bequests for it and had talked with testator "a lot about the college" and about the gift of

$2000. The testator was originally a man of strong physical and mental powers, hard-working and hard-headed. The trustee, who is also made executor, is a son of the scrivener—a college student, twenty-two years of age, who had never managed a farm, rented one, collected rents or kept up its repairs. Testator's daughter was married and lived in California, and the son was married and lived in Kansas, but aside from these facts no satisfactory reason appears why they were set aside and such extensive powers invested in the inexperienced trustee. They were both intelligent and of mature years, with two children each. Neither had dissipated the property their father had advanced them, and the daughter's advancement had increased in value. Their personal relations with him had always been good prior to the execution of the will. The scrivener testified that the testator said to him that his son and daughter had not cared for what he had given them and would not care for any other property he might give them. The testator was feeble in mind and body about the time the will was executed, had cancer of the stomach, was usually under the influence of morphine or other drug administered to alleviate the pain, and often in a stupor. Numerous witnesses testified he was of sound mind at that time, and others to the contrary. *Held*, that the court could not say as a matter of law that there was no evidence of undue influence, and the question, under the circumstances, was for the jury to decide.

5. ————: Incapacity: Date of Will: Preponderance of Evidence. Although the preponderance of the evidence is that the will was executed on May 31st, the date it says it was executed, yet if there is substantial evidence that it was executed on July 1st, the question is one of fact for the jury; and there being substantial evidence that it was executed on July 1st, and the testimony that testator on that date lacked testamentary capacity to make a will being amply sufficient, the question of his capacity was one for the jury, although the testimony as to his testamentary capacity on May 31st is at best only debatable.

6. ————: ————: Instruction. An instruction for contestants which tells the jury that the person making a will must be of sound mind and defining sound mind as being "such a mind as enables a person executing a will to be capable of knowing his property, and understanding the reasonable claims of the persons who may have reasonable and natural claims on his bounty," is not erroneous. In fact, it could be stronger for contestants without transgressing the law.

7. ————: ————: Narcotics. Mental incapacity of the testator at the time of making a will invalidates it, though caused by morphine or other drugs, and though they were administered by a physician for medicinal purposes. Unsoundness of mind

may result from an excessive use of narcotics and morphine; and the evidence showing that they were administered, the only question for the jury to determine is whether or not at the time the will was executed testator was of unsound mind.

8. ———: ———: **Burden.** The burden is on proponents to show by the preponderance of the evidence that testator at the time of the execution of the will was of sound mind.

9. ———: **Natural Heirs.** The will devised the property to a trustee, requiring him to collect the income and annually divide it between testator's son and daughter, and upon the death of the survivor of them to turn over the *corpus* "to the natural heirs of my said daughter and son" *per capita*. *Held*, that the expression "natural heirs" was not used in a technical sense, but the testator meant thereby that his property should ultimately vest in fee in his own blood and his own grandchildren.

10. ———: ———: **Necessary Parties.** Where the will devised the property to a trustee, with a provision that he should manage it and turn over the net income to his son and daughter during their lives, and at the death of the survivor the *corpus* should at once vest in their "natural heirs" *per capita*, the children of the son and daughter then *in esse* were not necessary parties to a suit to annul the will, nor were their unborn children, either by themselves or by said trustee.

Appeal from Platte Circuit Court.—*Hon. Alonzo D. Burnes,* Judge.

AFFIRMED.

*George W. Day* and *James H. Hull* for appellants.

(1) The grandchildren of James A. Naylor, to whom he devised a large part of his estate, were necessary parties to this action. The court below should have arrested the judgment because of the failure to make them parties. Appellants are entitled to complain of the defect of parties, although their complaint be for the first time made in this court. Wells v. Wells, 144 Mo. 202; Eddie v. Park, 31 Mo. 513; Rush v. Rush, 19 Mo. 441. (2) One who is capable of comprehending his property and all persons who reasonably come within the range of his bounty, who has sufficient intelligence to understand his ordinary business and to know what disposition he is making of

Naylor v. McRuer.

his property, has sufficient capacity to make a will. Turner v. Anderson, 236 Mo. 523; Crumm v. Crumm, 231 Mo. 638; Weston v. Hanson, 212 Mo. 266; Holden v. Cochran, 208 Mo. 410; Knapp v. Trust Co., 199 Mo. 663; Goodfellow v. Shannon, 197 Mo. 271; Meier v. Buchter, 197 Mo. 68; Riggin v. College, 160 Mo. 579. (3) The rule requiring comprehension of his property does not mean that the testator must be able to recall all of his property. Couch v. Gentry, 113 Mo. 256. (4) Nor need he understand the scope and bearing of the will as prepared by his legal adviser. Couch v. Gentry, 113 Mo. 256. (5) Ability to transact business is not the test of capacity to make a will. One may be incapacitated to transact business and yet be able to make a valid will. Gibony v. Foster, 230 Mo. 133; Knapp v. Trust Co., 199 Mo. 663; Hughes v. Rader, 183 Mo. 703; Hamon v. Hamon, 180 Mo. 685; Crossan v. Crossan, 169 Mo. 639; Wilson v. Jackson, 167 Mo. 135; Kirschbaum v. Scott, 166 Mo. 227; Maddox v. Maddox, 114 Mo. 41. (6) Non-expert witnesses may testify regarding the mental condition of a person, but they must first testify as to the facts existing in their own knowledge, which form the basis of their opinion. The value of such opinions depend wholly upon the opportunity the witnesses had to observe the conduct of the person whose mind is in question, and upon the incidents actually observed. Huffman v. Huffman, 217 Mo. 230; Winn v. Grier, 217 Mo. 449; Sharp v. Railroad, 114 Mo. 100. (7) To constitute undue influence, there must be present, and in active exercise, over-persuasion, coercion or force, fraud or deception, breaking the will power of the testator— destroying his free agency at the very time of making the will. Turner v. Anderson, 236 Mo. 523; Fulton v. Freeland, 219 Mo. 519; Teckenbrock v. McLaughlin, 209 Mo. 550; Crowson v. Crowson, 172 Mo. 702; Schierbaum v. Schemme, 157 Mo. 16; McFaddin v. Catron, 120 Mo. 275. (8) Advice, arguments, per-

suasions, solicitations, suggestion or entreaty, is not undue influence unless it be so importunate and persistent, or otherwise so operate, as to subdue and subordinate the will and take away its free agency. Gordon v. Burris, 153 Mo. 239; Berst v. Moxom, 157 Mo. App. 342. (9) While the use of drugs may destroy testamentary capacity, the disability ceases when their use is discontinued or their effect passes, and morphine given to allay pain, in the doses prescribed for Mr. Naylor, would have no influence upon his mind. Schierbaum v. Schemme, 157 Mo. 7; Martin v. Bowdern, 158 Mo. 379; Slingloff v. Bruner, 174 Ill. 565; Bush v. Lyle, 89 Ky. 397; Dieffenbach v. Grace, 56 N. J. Eq. 365. (10) The will made by Mr. Naylor in February, 1907, was important evidence showing the state of his mind, as well as the state of his affections and desire to bestow, to be the same in May (or July), 1907, when the new will was made. Lindsey v. Stephens, 229 Mo. 617; Thompson v. Ish, 99 Mo. 171. (11) Mrs. Naylor's testimony is seriously impaired by her acceptance of the provisions of the will made for her benefit. Hines v. Hines, 147 S. W. 777; Stone v. Cook, 179 Mo. 534. (12) If this court finds that there was no substantial evidence of incapacity to make a will or of undue influence, then the case should be reversed, with directions to the court below to enter a judgment sustaining the will, notwithstanding the defect of parties. The parties omitted were infants; will take nothing unless the will be sustained; if made parties to the case they must be defendants; a guardian *ad litem* be appointed for them, who must in their behalf seek the upholding of the will. (13) It is the province of this court to examine the record to see if there is any substantial testimony to authorize the submission of the case to the jury, and if not to reverse the judgment. Winn v. Grier, 217 Mo. 447; Hamon v. Hamon, 180 Mo. 685; State ex rel. v. Gui-

notte, 156 Mo. 521; Crossan v. Crossan, 169 Mo. 631; McFaddin v. Catron, 138 Mo. 197.

*Francis M. Wilson, Andrew Gresham* and *Hughes & Whitsett* for respondents.

(1) The children of Mrs. Olmstead and of Randall Naylor were not necessary parties. The will does not vest any estate in them. They are neither heirs of James A. Naylor, nor legatees or devisees. Acord v. Beaty, 148 S. W. 902; Collins v. Crawford, 214 Mo. 183; Am. Bible Society v. Price, 115 Ill. 644; Green v. Grant, 143 Ill. 61; Miles v. Davis, 19 Mo. 414; Brass Mfg. Co. v. Boyce, 74 Mo. App. 343; 22 Ency. Plead. & Prac., 164; Richardson v. Means, 22 Mo. 495; Morrow v. Morrow, 113 Mo. App. 454; Taylor v. Adams, 93 Mo. App. 280; Story's Eq. Pld., 140-150; Reinders v. Koppleman, 68 Mo. 482; Sikemeier v. Galvin, 124 Mo. 368; Campbell v. Watson, 8 Ohio, 498; Owen v. Eaton, 56 Mo. App. 463. (2) A will contest is an action at law, and being such, the appellate court will not reverse the judgment, because, in the opinion of the court, the jury found against the weight of the evidence, but will do so only when, on an examination of the testimony, no evidence is found to support the verdict, or upon which it can be based. Roberts v. Bartlett, 190 Mo. 680; State ex rel. v. Guinotte, 156 Mo. 520; Knapp v. Trust Co., 199 Mo. 640; Mowry v. Kettering, 204 Mo. 173. (3) The court did not commit error in refusing to instruct the jury that there was no evidence of undue influence. On the contrary, the court committed error injurious to the plaintiffs in declining to submit that issue to the jury. Roberts v. Bartlett, 190 Mo. 680; Mowry v. Kettering, 204 Mo. 173; Bridewell v. Swank, 84 Mo. 455; Barkley v. Barkley Cem. Assn., 153 Mo. 315. (4) The will read in evidence was not the will that James A. Naylor directed to be written, and hence was not his will. Bradford v. Blossom, 207 Mo. 177; Cowan v. Shaver, 197 Mo. 203 (4th par. of syllabus). (5) The evidence

introduced by proponents of the will was not sufficient to establish the will, as required by the statute. Sec. 553, R. S. 1909; 2 Wigmore on Evidence, secs. 1302, 1308, 1309.

FARIS, J.—This is an action under the statute to contest the will of one James A. Naylor, which comes here on appeal from the circuit court of Platte county. The defendants below are the appellants here. The original petition was filed on the 19th of January, 1909, in the Circuit Court of Platte county, and the case was tried therein on the 7th day of December, 1909, at the December term of said court.

The grounds of contest, as we gather from the amended petition, upon which the case was tried, are two, namely: (a) Undue influence averred in the petition to have been exercised upon the testator by the agents and attorneys of defendant Park College, and (b) lack of testamentary capacity, superinduced by an unsound mind arising from old age, and, as it is further averred, from the "excessive use of narcotics, morphine and other deleterious drugs." The petition for relief prayed the court to test the validity of the instrument in question and to that end to frame an issue whether such instrument was or was not the last will and testament of said James A. Naylor, to the end that the same might be declared nulll and void.

The answer of defendant Board of Trustees of Park College averred that the instrument in question was the last will and testament of said Naylor; denied generally the allegations of undue influence and lack of testamentary capacity, and prayed that an issue be framed as to whether such instrument of writing was, or was not, the last will of said Naylor, and that the same be adjudged to be in fact the testator's last will and testament. Answering in his individual capacity, defendant Duncan McRuer also denied generally the

allegations of the petition as to undue influence and lack of testamentary capacity. In his answer in the capacity of trustee, defendant Duncan McRuer made general denial in like manner as his co-defendant, and likewise prayed that an issue be framed touching the validity of the will and for judgment that such instrument was in fact the last will and testament of said Naylor.

In passing, it may be noted, that the amended petition averred that the death of testator occurred on the 12th day of August, 1907; that at the time of his death he was seized of an inheritable estate in real estate and personal property in said Platte county; that on the 31st day of May, 1907, or on some day between that date and the date of his death, testator signed and published the instrument in writing in question; (*as to the date of the execution of the contested will* a very sharp issue of fact arose upon the trial.)

The petition further averred that on August 12, 1907, the written instrument in question "was duly probated by the probate court in the said county of Platte," and that on the 28th of August, 1907, the defendant Duncan McRuer qualified as executor thereunder; that letters of execution (*sic*) were issued to him on the 2nd day of September, 1907, and that he thereupon took possession of the property purporting to be bequeathed and devised by the writing aforesaid, and that he was at the date of the filing of the petition pretending to act thereunder, as such executor. The above facts, of the death of testator in August, 1907 (precise date not given); of the seizin of the estates charged in the testator at the time of his death; of the probate of the will, and of the granting of letters testamentary, all as set out in the petition, were admitted by the several answers.

The trial was had before a jury, and resulted in a finding that the contested instrument of writing was

**Verdict.** not the last will and testament of James A. Naylor, and judgment was entered accordingly. From this verdict and judgment, defendants, after the usual motions for a new trial and in arrest of judgment, took and now prosecute this, their appeal.

The testator, James A. Naylor, was born on the 13th of January, 1838, and was therefore, at the time **Statement.** of his death, a little over sixty-nine years of age. He had resided for some sixty-five years in Platte county, Missouri. He owned in Platte county, two farms, sometimes referred to in the testimony as the "Hill Farm" and the "Bottom Farm," and containing in the aggregate some five hundred acres of land. He also had some two thousand dollars in cash, a small amount of other personal property, owned in Kansas City, Kansas, three lots, on two of which there were small frame cottages, and in one of which latter he was temporarily residing at the time of his death. He was by occupation a farmer, and is described by the witnesses as a man of splendid physique, possessing, in his years of activity, strong physical and mental powers. Some four years, however, prior to his death he became afflicted with cancer of the stomach; prior to this, and for some ten years prior to his death, he had suffered from locomotor ataxia. The immediate cause of his death, as the proof shows, was cancer of the stomach. About the 1st of April, 1907, after having been treated by numerous local physicians, he removed to Kansas City, for the purpose of being nearer and more convenient to medical treatment. He seems to have been almost constantly under medical treatment from the year 1903 till his death. After his removal to Kansas City, Kansas, he was constantly, except on two occasions, confined to his house; on one of these occasions he went to a bank in Kansas City, Missouri, and was absent about an hour; on the other occasion, he went to Park-

ville in Platte county, became very ill there and was brought to his home in Kansas City, Kansas, by a cousin.

The plaintiffs in the case are Randall B. Naylor, son of deceased testator; Elfie Olmstead, his daughter; Z. T. Olmstead, husband of the said Elfie (and who, except as such husband, has no other interest in this case), and Lucy M. Naylor, widow of the testator. Randall B. Naylor and Elfie Olmstead are the sole surviving children of the testator. At the time of this suit the said Randall is shown to have been married, to have been of about the age of thirty years, and to have had two children; the said Elfie is shown to have been about thirty-five years of age, married and the mother of two children.

Defendant Park College, which is sued by its board of trustees, is a corporation, the governing power of which seems to be vested in a board of trustees. "Park College Family" is an adjunct of Park College, which college, as its name indicates, is an educational institution, located at Parkville in Platte county. The precise nature of Park College Family, except that it is "an adjunct" to Park College, is left from the testimony somewhat obscure; but it seems to have been a department of the college governed and managed by the board of trustees thereof, partly maintained by said board, and partly, and, as witnesses say, very largely, by voluntary contributions. The object of Park College Family was to render financial assistance to indigent students of Park College, to enable them to obtain an education by affording opportunities to such students for manual labor and by means of the voluntary contributions referred to, to donate to such students small sums of money to eke out such earnings. Defendant Duncan McRuer was the trustee named in the will, hereinafter set out, and was also, as heretofore stated, named as executor thereunder. He was a young man, a student at the time in Park

College, and a son of John T. McRuer, an attorney at law residing at Parkville, and the attorney who drew the will in question.

The will which forms the subject of this action, and about which the contest was waged, is as follows:

"I, James A. Naylor, of Platte county, Missouri, do make, publish and declare this my last will and testament, hereby revoking any other such instrument by me at any time heretofore made.

"First: I direct that all my just debts, including the expenses of my funeral, shall be paid as soon as possible after my decease.

"Second: To my beloved wife, in lieu of dower and all other allowances to which she may be entitled by law, I give, devise and bequeath all my household furniture, bedding, dishes, utensils and other articles used in or belonging to my household at my death, to be hers absolutely and forever; also lots twenty-six, twenty-seven and twenty-eight, block three, in Husted and Stumpf's Addition to Wyandotte City, now Kansas City, Wyandotte county, Kansas, to be hers for and during her natural life.

"Third: The remainder, after the term of the life estate of my wife in and for said lots twenty-six, twenty-seven and twenty-eight, block three, in Husted and Stumpf's Addition to Wyandotte City, now Kansas City, Wyandotte county, Kansas, has expired, I devise to the Board of Trustees of Park College, to be held, disposed of, invested or re-invested by it from time to time as it deems best, for the sole benefit of Park College Family, the income thereof to be devoted to the maintenance of said Family, forever.

"Fourth: I give, devise and bequeath unto Duncan McRuer, of Parkville, Platte county, the residue of my estate, of whatsoever nature and wheresoever found, the same and all of it to be held in trust and

248 Mo.—28

managed, preserved and disposed of as hereinafter directed, that is to say:

"(1)   He shall, immediately after my decease, take possession of my real estate, other than that devised to my wife for life with remainder to the Board of Trustees of Park College for the use of Park College Family; leasing, repairing, insuring, and rebuilding any improvements thereon which may be destroyed, if in his judgment such rebuilding is desirable; collecting the rents therefrom, and in every way caring for the same, while possessed thereof, in a good businesslike manner, to the extent, that I might or could do if living and possessed of the same; paying from the income thereof all taxes, expenses or other charges of any kind arising out of, or necessary to, the proper management of said estate as aforesaid.

"(2)   I desire that he shall keep an oversight of the affairs of my said wife, to aid and advise her in her business matters; to see that she is at all times properly cared for; to pay her out of the income of the real estate in his hands as trustee, during her lifetime, the sum of one dollar per day, said payments to be made twice each year or oftener, if requested by my said wife, and the funds in his hands permit; or in case of misfortune befalling my said wife, whereby my said trustee deems it necessary or expedient, he may pay for or to my said wife such further sums of money out of said income as he may have on hand, sufficient to relieve or help aid such misfortune; and upon the death of my said wife, I direct that said trustee shall see that she is decently and properly buried, all in a manner in keeping with my estate, and that he pay the costs and expenses thereof.

"(3)   Said trustee shall, as speedily as he deems best, convert all of my personal estate not heretofore given to my wife or necessary to be used in paying my debts, into money, all of which he shall turn over to the Board of Trustees of Park College, the same

to be held in perpetuity by the said board for the use` of said Park College Family; and if the fund arising out of such personal estate amounts to less than two thousand dollars, he shall, out of the income from the real estate in his hands as aforesaid, other than that which may be needed for my wife as above specified, annually pay to said Board of Trustees, for the use and purposes aforesaid one-half of said income, until it shall have been paid by him the full sum of two thousand dollars; and the fund thus created, together with the property hereinbefore devised to said board, shall be held by said Board of Trustees as hereinbefore provided, and forever known as the James A. Naylor Scholarship Fund; it being my purpose to make the fund arising out of my personal estate amount to two thousand dollars in any event, but if more than two thousand dollars should be realized out of my personal estate then the whole sum so realized to go to said fund; and in order to make this bequest out of my personal estate effective immediately on my death, said trustee shall, from the date of my death, pay said board interest on two thousand dollars at the rate of six per cent. per annum until such time as he shall have paid said board at least two thousand dollars out of said fund.

"(4) Said trustee shall, annually, and upon the 1st day of January in each year, pay over to my daughter, Elfie, wife of Z. T. Olmstead, of Los Angeles county, California, and to my son, Randall B. Naylor, of Leavenworth county, Kansas, the balance of the net income from my estate after making the payments and expenditures hereinbefore named, dividing the same equally between them and continuing said payments so long as both my said daughter and son shall live; and when one of them shall die, his or her share shall in like manner be paid to the natural heirs of said deceased, so long as the survivor shall live, said survi-

vor during his or her lifetime continuing to take the other one-half of said income as above provided.

"(5)   Immediately after the death of the survivor of my children aforesaid, I direct said trustee (in case my wife also be dead, and, if not, then not until her death) to account to and turn over to the natural heirs of my said daughter and son the residue and remainder of the estate coming to or remaining in his hands, said heirs to take, have and hold the same absolutely and forever, share and share alike, and not in representation of their deceased parents, respectively; and said trustee shall execute and deliver to the parties properly entitled thereto under this provision, all necessary deeds, writings or other documents required to vest the estate hereby created and devised in the beneficiaries named.

"(6)   Before entering upon the duties of the trust herein named, said trustee shall execute a good and sufficient bond conditioned for the faithful discharge of his duties, to be approved by the probate or circuit court of Platte county, Missouri; and if for any reason the trustee hereinbefore named should not accept the trust and qualify as such, or if he should die or resign or a vacancy should otherwise occur, then the circuit court of Platte county, Missouri, shall, as provided by law, appoint some other suitable person to execute the trust, which person I desire to be a responsible citizen of Pettis or Waldron township in Platte county.

"Fifth:   I do nominate and appoint Duncan McRuer, of Parkville, Missouri, executor of this will.

"In testimony whereof, I hereunto subscribe my name this 31st day of May, A. D. 1907.

                                    "JAMES A. NAYLOR.

"We attest the foregoing will by subscribing our names hereto at the request of the said James A. Nay-

lor, and in his presence and in the presence of each other, this 31st day of May, 1907.

"JOHN T. McRUER,
"GEORGE W. BARNES."

As offered upon the trial and as admitted in the pleadings, an order of probate was entered by the probate court of Platte county on the 27th of August, 1907. (The pleadings charge and the answers admit respectively, that probate was had on August 28, 1907; evidently an error but in nowise pertinent.) The will was witnessed by George W. Barnes and John T. McRuer, as aforesaid, the latter the attorney who drew it. Their statements pursuant to statute, were taken by the probate court at the time of entering the order and attached in due form to the alleged will.

Defendants upon the trial, as proponents of the alleged will, assumed the laboring oar, and called, among other witnesses, John T. McRuer, who testified in substance that he was one of the subscribing witnesses to the will; that the other subscribing witness was Mr. George W. Barnes, or a gentleman introduced to him by the testator as George W. Barnes; that he saw the testator sign the will; that this signature was had in the presence of the witness and said Barnes; that the testator declared the instrument to be his will, requesting the witness and Barnes to sign the same as subscribing witnesses, which they did in testator's presence and in the presence of each other. The witnesss further stated that George W. Barnes, the other subscribing witness, was at the time of the trial, in St. Clair county, Missouri, and that he had ascertained this fact on the preceding Monday. (Barnes was not a witness in the case for either side upon the trial.) Witness McRuer further stated that he had known the testator since about the year 1882; that he (witness) was an attorney at law and was for many years the adviser and counselor of testator. Quoting this witness in this behalf, upon being asked whether he ever

acted as counsel for testator, he replied: "Well, Mr. Naylor never had a lawsuit that I remember of, but he would come to me in all matters that bothered him pertaining to law. He frequently came to my house and called upon me and I was, he claimed, his adviser and counselor in that line." Witness McRuer further stated in substance that he had on February 22, 1907, drawn another will for testator, but that some mis-stakes and discrepancies and other errors occurring therein, he was called to the home of testator and re-quested to prepare the will in controversy. That prior to the preparation by witness of the first will, testator had spoken to him sometime in the winter of 1906 and '07 with reference thereto, stating to him certain pro-visions that he desired to make in his will for the bene-fit of Park College Family. Later, the witness says, he was called to the residence of testator in Platte county; that he had a conversation with testator touch-ing the terms of the proposed will, in which testator said to him that "he wanted his wife to have a dollar a day and to have the use of the property in Kansas City, Kansas, during the term of her natural life." That the witness and testator's wife were present and that she was asked by testator whether the provisions proposed for her were satisfactory, and that she an-swered that they were. Other matters occurring at this conversation are shown by the below excerpt from this witness's testimony:

"He says, 'I want all I have got in the way of household furniture and such as that to go to the old lady, and I want her to have the use of the house and lot in Kansas City during her life and then I want it to go to Park College the same as the other. I want two thousand dollars to go to Park College Family. It will help some poor boy or girl to get an education. I want it to go in my name.' I had stated to him be-fore and I re-stated to him how it could be done. That it would assume the form of a scholarship which

would provide sixty dollars a year at six per cent, being one thousand dollars. That was calculated to be enough, with what the college itself provides, for clothing and board and to get text-books and tuition and carry a student through the year. That would carry two.

"Q. You mean two thousand dollars at interest? A. Yes, sir.

"Q. Was that what he said to you? A. Yes, sir.

"Q. And two thousand dollars would carry two students? A. Yes, sir; two thousand dollars he wanted to put in. That was the sum. He says, 'Now, I want that perpetuated just as long as that Family exists there. As long as poor girls and boys come there,' or something like that. He says, 'Now, in regard to this property here: I have these two farms and I want that to stay in my own blood just as long as I can keep it. I want you to make it that way in preparing the will. My son and daughter haven't cared for what I have already given them and they will not care for this. However, I want them to have the benefit through life from this property. I want them to have the profits from this property as long as they live and my wife lives. After that I want it to go to my grandchildren to take care of them. They are the ones I am looking out for. They are as much my blood as my son and daughter are.'

"Q. What, if anything, was said about any one to care—A. Well, that came up sometime before, I think. He said he wanted a young man, one who would be there probably permanently and who was of good habits and station and whom he could trust to take care of that property to go ahead and dispose of it; carry the property on.

"Q. Carry out the provisions of the will? A. Carry them out in the proper manner. I suggested Walter Higgins, a young man who—

"Q. Did he know him? A. Yes, sir; he did. I mentioned Walter's name. Says he, 'Have you no boy

of your own old enough to be trustee in this matter?'
I told him yes. I says, 'Yes, I have a boy who is of
age.' He says, 'Well, I want to see him. You send
him up and let me talk to him.' He instructed me to
hold the matter of writing up the will until he had de-
cided on the trustee. Which I did. I think it was af-
ter that he told me he had talked with George Naylor
about it and George said he believed it was a good
selection. Anyway I got word to insert his name in
the instrument.

"Q. Whose name? A. Duncan's, Duncan Mc-
Ruer's.

"Q. Your son he had spoken of? A. Yes, sir.

"Q. Mr. McRuer, coming back to the time when
'Exhibit A' was executed, and the time when you went
over to Kansas City, Kansas, with it, I will get you
to state the physical condition Mr. Naylor was in at
that time? A. He wasn't well. He was complaining
very considerably."

On cross-examination this witness stated that he
had been in the employ of Park College since the year
1901; that during that time he was more or less as-
sociated with Mr. McAfee in taking care of some of
the Park College affairs; that he was also for a cer-
tain time private counsel for Mr. McAfee; that Mr.
McAfee was the business manager of Park College,
and that Mr. McAfee asked him to cooperate with him
in the work for Park College Family; that witness
and said McAfee did cooperate in that work for years.
"Whenever it was necessary for Mr. McAfee to do this
work I was with him. Whenever there were deeds
to write or leases to take care of I did it. Whenever
there was any work he wanted done along those lines
and he asked me to do it I did it. You may call that
'handy man' or not, just as you please about that. It
is true that we did the work together. I was associ-
ated with McAfee in the work for Park College Fam-
ily, and whatever way that affected the college I

worked for Park College.   Whenever he told me to do
anything I did it as well as I could and as quick as I
could.   If I saw anything in connection with the Fam-
ily that needed attention Mr. McAfee didn't have to
tell me.''   This witness stated that sometimes or at
least on two occasions he solicited bequests for Park
College and Park College Family.   The witness also
stated that he began advising testator as a lawyer
sometime in the early nineties, but that testator had
but little law business to attend to and that they were
closer to one another than mere lawyer and client;
that, in the discussion of the proposed will with testa-
tor, when the matter of selecting a trustee and execu-
tor was under discussion, the witness suggested to
testator one Walter Higgins,  a man of about thirty
years of age, and urged upon testator the selection of
said Higgins, but that testator inquired of him if the
witness didn't have a son who was of age, and that
witness confided to him that he had.   Thereupon,
touching the age, qualifications and attributes of de-
fendant Duncan McRuer, the son of witness who was
made trustee, the following occurred:

"Q.  Well, how old was your son at that time? A.
I think he was about twenty-two.

"Q.  Was he twenty-two at that time?  A.  Yes,
sir.  May be twenty-three.

"Q.  He was twenty-three?  A.  May be. I think
so.

"Q.  Was he a student in Park College at that
time?  A.  Yes, sir.

"Q.  Had he ever attended to business of that
character before?  A.  No, sir.

"Q.  He was then a college boy?  A.  Yes, sir.

"Q.  Had he been an intimate friend of Mr.
Naylor's?  A.  No, sir.

"Q.  Mr. Naylor never knew there was such a
boy in existence until you told him?  A.  Oh, yes, he
knew him, but he didn't know he was of age.

"Q. He suggested it to you, but you said you had a boy in answer to his question? A. Yes, sir.

"Q. What did he say to you? A. Why, he inquired concerning him. What kind of a boy he was.

"Q. Didn't he know him? A. And I told him—

"Q. Will you answer my question? A. I was telling you what he asked me about this boy. You asked me for it. I told him he was a good boy and never had any trouble. That he always assumed the responsibility at home and was a good boy. He told me to have the boy come up there, that he wanted to see him. I told him I didn't know whether it was worth while considering my boy or not, because he had his college duties to attend to and if it would interfere with that I didn't want him to have anything to do with it.

"Q. Well, you afterwards found that it didn't interfere? A. I had nothing to do with it. I let the boy pursue his own course.

"Q. He didn't consider that it interfered with his college duties? A. I consider he thought so.

"Q. You were his guide in that matter?

"Defendants object for the reason the question calls for a conclusion of the witness. Objection overruled by the court. Defendants except to the ruling of the court.

"A. Why, I certainly felt that I had the right of guidance over my own boy. If I found out that it was interfering with his duties I would have opposed it.

"Q. He was twenty-three years old? A. Yes, sir, but he was still under my guidance. He was right there and attending school and whenever I felt that it was for his interest to oppose anything I would have done it.

"Q. But you, as his guide, finally reached the conclusion for him—A. No, sir.

"Q. Well, he was acting under your guidance?

You just said so. A. No, sir; I allowed the boy to pursue his own course.

"Q. Didn't you just say if you thought it was against his interest as a student, you would have opposed it? A. Yes, sir; I would."

Witness McRuer further says that he afterwards had a talk with testator in which testator requested him to send his son Duncan McRuer up to see him; that he wanted to talk with Duncan before the will was completed; "he wanted to size him up and see that he had the same ideas of business he had." That testator afterward told him that the boy suited him and he wanted him as his executor; that the boy had the same ideas of business and of repairing and keeping up land that he had. It appears from this witness's testimony, however, without quoting it, except in substance, that defendant Duncan McRuer had never "run" a farm, nor had he ever rented a farm or collected rents therefrom, or kept up repairs thereon or looked after them generally in anywise; that he had never been engaged in business for himself or for anybody else prior to that time; that he was attending college at the time the will was drawn, but that he had worked with his brother on a farm for three or four years prior to this. This witness also testified touching a conversation had with testator about the changes in the terms of the will of February 22, 1907. This conversation occurred in Kansas City, Kansas, at the home of the testator. According to the witness testator said: "Mac, you have made a misdescription in the real estate here, these lots. He showed me where the mistake was. We talked about it, and I corrected it with pencil upon the old will. He then said, 'I want this property here instead of going to the grandchildren I want that added to my bequest to Park College. I feel I ought to do more for Park College than I have done, and I feel it's right and justice to all that I give them in addition to the two thousand

dollars, this property.' He said: 'I want, however, that to be disposed of just as they want to do it. I don't want that bound up like this two thousand dollars.' We discussed that. I made a memorandum to that effect. That was sometime in May, about the 18th or 20th somewhere in there; two or three days before the will was drawn.''

In passing, it may be said that the will of February 22, 1907, was similar to the one in controversy here, except that but one lot in Kansas City was mentioned and that was misdescribed; that the first will gave a life estate to the widow of testator in the said lots with the remainder over in the "natural heirs" of testator's two children, while the will in question devises this remainder to Park College; the first will further provided that payment to the *natural heirs* of his children should be deferred until the death of his wife and that these heirs should take *per stirpes*, while the will in question provides that they shall take *per capita*. There were other minor differences, not necessary, however, to mention here.

As stated above, there is a sharp contest in the proof as to the date at which the will in question was actually signed by testator. Barnes, the other of the subscribing witnesses, was not called as a witness and did not testify upon the trial. The widow, Lucy Naylor, says that the will was not signed till July 1, 1907; the witness McRuer, while stating that it was in fact signed on the 31st of May, 1907, is apparently not so frank about the matter as he might have been. On cross-examination the following occurred:

''Q. The will was signed the 31st of May, you said? A. Yes, sir.

''Q. That is true, the date? It was the 31st of May when the will was signed and witnessed—this purported will? A. The date shows there, whatever it is.

"Q. The date shows the date it was signed? A. Unless a mistake was made in relation to the date.

"Q. Take the will, this instrument, this purported will, and tell the court if you know when the testator signed the will. A. The will is the 31st of May. That is the best evidence I have on hand.

"By Mr. Hughes: Well, what do you say about it? A. I say the 31st day of May. I certainly could not make a mistake in the date.

"Q. You witnessed that will? A. Yes, sir.

"Q. On the 31st of May, 1907? A. Yes, sir."

This witness also says that he saw the widow, Mrs. Naylor, on that day; that he spoke to her, but doesn't remember that he had any conversation with her about his business there and doesn't know that testator had any such conversation with her. That at the time of the execution of the will in question testator was up and walking around the house; that he was mentally strong and of sound mind, and that he gave no evidences of the fact that he was suffering from any sort of narcotic or drug or from any mental weakness; that he, witness, was there an hour and a half or two hours; that testator during that time was sometimes reclining upon a couch, and sometimes sitting up, and that testator asked him to read to him the will, which witness did. That testator took the will and began to "peruse" it, but that he could not say whether he read it all or not; that he seemed to study over it for five or ten minutes.

Witness J. P. Tucker, testifying for the proponents of the will, states that he never saw the testator after he went to Kansas City; that he doesn't recall having seen him later than sometime in the fall of 1906; that he then appeared to be very strong and robust; was a man of splendid physique and always impressed witness as being a man of strong physical and mental powers; that he took him to be about seventy-eight years of age; that his age was a matter of con

jecture with the witness, and that he took him at that time to be and so considered him, a man of sound mind.   On cross-examination, witness Tucker admits that he is a member of the board of trustees of Park College.

Daniel Lowmiller, a witness for proponents, testified in substance that he had known testator for some forty years; that he saw him in February or March, 1907, and that his condition was then all right so far as witness could see; that mentally he then appeared to be all right.   This witness says that he again saw testator in Kansas City sometime in April; that testator then said to him that he was not at all well and that he looked to witness as if he were not well, "looked some tottery and bad," and that he could see no material change in his mind on the last occasion and that he supposed he was all right; that he would call him a sound man as far as his judgment went.

Dr. Samuel L. McAfee, called as a witness for the proponents, testified that he was a retired professor of Park College; that he had been an active teacher from 1889 up to three years before the trial; that he knew the testator casually and that sometime prior to the latter's going to Kansas City, Kansas, he had a conversation with him in which testator stated that he had concluded to do something to help Park College; that he had known it since he had been there, had known of its doing good to the young men and women attending there and of its fitting them for useful lives, and that he wanted to do something for it; that he questioned the witness as to how he could arrange it, and this witness referred him to Mr. H. B. McAfee. Dr. McAfee also stated that in this conversation testator told him that he had given to his family about all he intended to give them.   This witness gave it as his opinion that testator, at the time of the conversation witness had with him, was of sound mind; that he never thought of anything else.

Margaret Hasenyager, testifying for the proponents, says in substance that in March, 1907, she was a stenographer in the office of H. B. McAfee, and that in the early part of March she went to the house of testator to take his affidavit; that Mr. McAfee had been trying to obtain data as to the early days of Parkville and the college, and to this end was having the old residents make statements about the early days; that she went to testator's residence at the direction of Mr. McAfee and Mr. McRuer, and that Mr. McRuer accompanied her. That she remained at the house of testator for some two hours obtaining from him a statement of his early life and of facts within his recollection touching Platte county in the early days; matter of war history concerning testator and Parkville, and that from her notes, she reduced testator's statement to writing. From her conversation with him and from his manner and appearance she gave it as her opinion that he was then sound mentally. The statement taken by the witness in shorthand and later transcribed by her was offered in evidence with the view of throwing light upon the mental condition of testator. In passing it may be said that the taking of this statement at the time it was taken, as well as the manner of taking it and preserving it, appears, to say the least, in a somewhat sinister or storm-cellar light. The point, however, we reserve for later comment.

H. B. McAfee testified for proponents in substance that he had for many years and up to the preceding July resided in Parkville; that he was a student from 1875 until 1880 of Park College, and ever since the last mentioned date he had been connected with the institution as teacher or business manger, and that from 1890 continuously he had managed the school himself, and that prior to that time for some four years he was assistant manager. This witness stated that he saw testator not a great while before the latter's death

at his home in Kansas City, Kansas; that testator sent for him; that he went and had an interview with him which lasted some little time; that the witness expressed to testator his appreciation of the provisions made in the will for the college; that testator spoke of his pleasure in making the gift; that he said he regretted that neither of his children had taken an education, and that he wanted to make it possible for some young people to get an education; that he had none himself and that his children had not cared for one. This witness states that from his conversation with testator he was of the opinion that he was of sound mind, though possibly he was much grayer than when he last saw him, and that he thought he was a sick man physically.

Duncan McRuer, testifying for proponents, said in substance that he is the person named as executor and trustee in the will in question; that he had known testator about four months prior to the latter's death, though he had seen him from time to time for some four years prior thereto; that in the latter part of February or March, 1907, he went to the house of testator at the latter's request, for the purpose of seeing him; that before that the father of witness had told him that Mr. Naylor wanted to see him, but when he went to see testator he did so in response to a call from some of the neighbors, advising him of testator's wish to see him. What occurred is shown by the witness's statement in his own words:

"Q. Now, I wish you would begin at the time when you first met him at his home on that occasion and state to the jury all you recall of what he said to you on that occasion. Just in your own way. A. Well, as I remember it he was reclining on the couch. It was about nine or ten o'clock in the forenoon, probably a little earlier than that. When I went in I introduced myself to him as McRuer and he said he had been expecting me. He stated he had a bad spell

the night before and told some incident of Mrs. Naylor going to the neighbors and some things like that. He then stated why he sent for me.  He was looking around for someone to see after his business and attend to his affairs after he was under the ground.  He said he wanted a young man and didn't know where to find one he would be better suited with than myself. Doctor Winters, the practicing physician in Parkville, was present, and he asked him what he thought of his choice, or of the choice he was about to make.  The Doctor just jokingly expressed his opinion.  After the Doctor left we went to the front porch.  It was the spring of the year or late winter.  The day was mild. He said he sent for me because he wanted me to go over the place with him and see all the land and meet the tenants and hands there, but that he wasn't able to go.  After we had been on the porch for sometime we passed through to the kitchen and out towards the barn and put up the horse I had driven there.  He stated that it was the first time he had been without a horse since he was a boy about sixteen years of age. He pointed out a patch of corn, or where corn had been, and said that a man had tried to beat him out of a load of corn there, and that when I got hold of his affairs, if I ever did, he wanted me to do like he did on that occasion.  If a man tried to beat him to see that he didn't do it.  If he was in need to give him the corn.  We went in the dining room to eat dinner. After dinner Mr. Naylor laid on the couch awhile and very shortly we went out on the porch.  The house was in such a location to the principal buildings of the college that a very good view could be obtained of that building.

"Q.  You mean Park College?  A.  Yes, sir; recitation hall.  It's a large, slate-colored stone building. We had a very good view of it.  One that I had not heretofore had of Parkville, although I had lived a

248 Mo.—29

great many years there. I remarked on the splendid view from there. When I made that remark he said it was a building that had turned out worthy young men and women as he had observed. It was in that connection he advised me of the fact that he had two thousand dollars in the Missouri Savings Bank in Kansas City, Missouri, and said if I suit him and managed his affairs after he was gone, I was to take that two thousand dollars, that was not needed to pay his just debts, and turn it over to Park College. That he had decided that was where the money should go. He wanted to make worthy young men and women and he thought that college educated them when they could not get an education otherwise. He was a great hand to chew tobacco, and he had at that time took a plug from his pocket. We had a view of his real estate, part of it, and he took a chew of tobacco and says, 'People may wonder why I don't leave my business to my own boy; I would, but he don't think as much of this land as I do of this chew of tobacco.' My acquaintance not having been very intimate I wondered at the remark, but those are his exact words as I remember them. He said that he didn't value it as much as he did the plug of tobacco. That he had already given him seven or eight thousand dollars and that today he didn't have a dollar. He referred to the disposition of the land and said he wanted it to go to his grandchildren, that they ought to have it. He said it was valuable land and the rent wasn't great because the land had run down and the improvements were not in extra good shape. That was the hill land. He said the bottom land, in case there was no overflow, would rent from twelve to fifteen hundred dollars, and he wanted this rent, after the taxes were paid and all debts on it, he wanted his children, Randall and Mrs. Olmstead, to have the rent, share and share alike. But after they both were dead, he and Mrs. Naylor, then the land was to be turned over. The trustee was to

turn everything over to his grandchildren that was in his hands. At that time he made no reference to the property in Kansas City, Kansas, except that he had bought a home there. That Mrs. Naylor and the folks thought he was worrying about the land and the crops and he wasn't very well and he was going away. He said that would be a home for Mrs. Naylor, in Kansas City, Kansas, after he was gone, and that he was going down there. That was practically all of the conversation at that time.

"Q. In order to refresh your recollection, I will get you to state if he said anything in that conversation about any provision for Mrs. Naylor, other than the Kansas City property? A. He said that it was his intention. He seemed a little worried about how to take care of the 'old woman,' as he usually called her. How to best take care of the old woman. He said he wanted her to have plenty and whenever she needed it. He said, 'I am thinking of giving her the cash and letting her have a home there, and in that way she won't have anything to see after and it will be taken care of. Whoever I name as trustee can attend to that. No matter what it amounts to, if it takes all the land, she has the first claim. Whenever she asks for money and needs it I want it given to her.' That was practically the conversation at that time, and I think it is practically the will although I didn't know that."

This defendant McRuer further testified in substance that at the time of this visit he did not know the will had been made; that witness's father had never mentioned or discussed the matter with him. He also says that he went to Kansas City, Kansas, on two or three occasions to see testator, and that on the occasion of his second visit about the middle of June, 1907, testator gave him a paper which the latter said was his will; that this instrument was in a plain envelope and that testator asked him to write thereon,

"Will of James A. Naylor," which the witness did; that he was requested to take this paper to the bank, obtain a lock box there and place the paper therein; that this envelope was not sealed, but that he did not examine the paper to ascertain whether it was a will or not; that he had never read it until he brought it to the probate office to be probated. Being asked to examine the will in question and tell the court whether it was the same paper or not, he answered: "Well, not having read this until I brought it to the probate office I am not overly familiar with it, but I judge it is the document. It's of a similar description. I am not positive of this." This witness also says that testator was, in his opinion, of sound mind.

After offering the will in dispute and also the will dated February 22, 1907, hereinbefore called the first will, proponents rested their case in chief. The difference existing between the first will and the will here in controversy has been heretofore in this statement briefly pointed out, and no further attention need here be given to this instrument.

On the part of the plaintiff, among others Dr. Reeves testified in substance that he was a practicing physician in Kansas City, Kansas; that he had treated testator from the 4th day of April, 1907, continuously until his death; that he found him suffering from cancer of the stomach; that this was a mortal ailment and that all that could be done was to maintain him as comfortable and as well nourished as possible, for the remainder of his life. On the 4th day of May the witness began administering opiates to relieve him; at first he gave him codeine, but this drug failed in its effect, and on the second of June, 1907, he began administering to testator morphine; that he continued this treatment until his death; that from the 4th of May testator was mentally in a stupid, sluggish condition, and from the second of June was continuously under the influence of morphine; that while under the influ-

ence of these opiates he was sluggish, sleepy and drowsy, and that when from under the influence of this drug his mental condition was decidedly bad, almost wild and maniacal from pain, and that there was no time from June 2, 1907, up to the time of his death when he was mentally capable of transacting business.

Dr. A. Naylor, called for plaintiffs, testified that he was a physician and surgeon, a distant relative, either a second or third cousin of testator; that he saw testator at his home in Kansas City, Kansas, on the 19th of June, 1907; that testator seemed drowsy and sleepy; didn't talk much and didn't recognize witness; that testator swore bitterly at his daughter, the plaintiff Mrs. Olmstead, and ordered her from his home.

Mrs. Lucy Naylor, one of the plaintiffs, and widow of testator, testifying for plaintiffs, stated that she and testator were married on November 3, 1898; that they moved to Kansas City in the first of April, 1907, in order to secure medical treatment for testator, who was and had been suffering from the disease which caused his death, continuously from the year 1903. Testator was afflicted, and had been so affected, with locomotor ataxia for ten years. She further stated that testator from the time he went to Kansas City, Kansas, had been out of the house but twice, and that on one of these occasions he went to Parkville and became so ill that a cousin brought him back home; that he was affected with cancer of the stomach and paralysis of his lower limbs. Relative to the date at which the will in question was executed, this witness averred positively that this occurred on July 1, 1907. She fixed the date by the circumstance of having purchased on that date a cemetery lot, and says that upon her return she found witness John T. McRuer at the house, and was requested by testator to call Barnes, one of the subscribing witnesses, which she did; that she obtained a pen and ink for them and left the room. That on the date in question the physical condition of tes-

tator was such that he was physically unable to hold a paper in his hands; that he was not able to transact any business or follow anything; that he was not able to understand what property he owned or the character of the property, or to remember those composing his family, and persons who had claims upon his bounty; that he was constantly in a stupor and this had been his condition for some two weeks prior to the first of July.

Elfie Olmstead, one of the plaintiffs, testifying for the plaintiffs, stated that she resided and had resided for some twenty-three years in California, going there with her father and mother at the age of about thirteen years; that after the death of her mother, her father, the testator, returned to Missouri, but that he made her visits every two years up to within three years of his death; that his last visit was in December, 1906, at which time he came with witness's stepmother and remained until March, 1907; that there was never, up to his last illness, any coolness or lack of friendship between witness and testator. She further says that upon learning of her father's serious illness about the first of June, 1907, she, with her husband and two children, immediately came to see him; that testator talked a little while with witness, seemed better, but later went into a stupor, and so remained for the whole of the day; that in her opinion his mind was decidedly unsound; that he was not like himself; that later, upon her return sometime in June, 1907, from a short visit to other relatives, her father cursed her very bitterly and ordered her to leave, and threatened, in the event of her refusal, to call an officer and have her ejected, and that from that time to the date of his death he gradually grew weaker mentally and physically.

Randall B. Naylor, one of the plaintiffs, called as a witness for plaintiffs, says that he was at his father's about the last of June or the first of July, 1907,

and that he didn't appear to know the witness; and that upon mention being made of testator's home place, he replied that he had no home place, and that testator didn't seem to know what he was talking about, and that if he had signed any papers at that time he would not know what he was signing.

George W. Naylor, a cousin of testator, testifying for plaintiff, says that he saw a great deal of testator during the spring and summer of 1907; that some three weeks after testator moved to Kansas City, which would place the date about the third week in April, 1907, the witness returned home and found testator lying ill on the porch of witness's house on some sacks, and that he regarded the condition of his mind as unsound, and very unsound at that; that testator saw some of his tenants but attended to no business with them; that he drew no leases, was not fit to draw up any; that he was crying and said he loved his children.

Plaintiffs also offered certain annual statements filed in the probate court by defendant Duncan Mc-Ruer as executor and trustee under the will, which showed, among other matters not pertinent here, the payment by said executor of the sum of $75 to John T. McRuer as attorney for said estate.

At the close of plaintiffs' evidence defendants requested the court to give three instructions, in effect demurrers to the evidence of the plaintiffs, and which are as follows:

Demurrer.

"1. You are instructed that there is no substantial evidence in this case that, at the time James A. Naylor subscribed his name to the instrument propounded as his last will and testament, he was of unsound mind.

"2. You are instructed that there is no evidence in this case that the instrument of writing propounded as the last will and testament of James A. Naylor was procured by undue influence.

"3. You are instructed that, under the law and

the evidence in this case, your verdict must be that the instrument of writing propounded as the last will and testament of James A. Naylor, is his last will and testament.''

The court refused to give all and each of the offered instructions, and defendants excepted.

Thereupon proponents recalled Duncan McRuer, who gave testimony tending to contradict the testimony of Mrs. Lucy Naylor in the matter of the date of the will in question, since this witness said that it was he and not his father, John T. McRuer, one of the subscribing witnesses to the will, who was present at the house of testator on July 1, 1907, when Mrs. Lucy Naylor returned from the cemetery.

At the close of all the testimony in the case defendant again offered the above quoted instructions in the nature of demurrers to the evidence, which the court refused to give. Thereupon the court gave, among others, the following instructions on the part of the plaintiffs:

Instructions for Respondents.

''1.   The court instructs the jury that while it is the law that one of sound mind may dispose of his property by will, yet it is also the law that before a will can be valid it must be proven that at the time it was executed the person making the will was of sound mind.  Sound mind as here used means such a mind as enables a person executing a will to be capable of knowing his property, and understanding the reasonable claims of the persons who may have reasonable and natural claims on his bounty.  Therefore in this case, unless the evidence reasonably satisfies the jury that James A. Naylor, at the time he executed the paper writing in controversy, possessed a sound mind, then such paper writing is not the will of the said James A. Naylor, and your verdict must be for the plaintiffs.

''2.   The court instructs the jury that if they find

and believe from the evidence that James A. Naylor, at the time he signed the paper writing offered in evidence as his will, was feeble in body and of unsound mind, and was so subjected to the excessive use of narcotics and morphine that by reason thereof and by reason of his physical debility his mind and memory was so impaired and weakened to such an extent that at the time he signed said paper writing (if you find he did sign it) he was incapable of understanding the nature and character of his property, or of understanding the natural objects of his bounty, or was incapable of understanding the nature and effect of the business in which he was engaged, then you should, by your verdict, find that said paper writing is not the will of the said James A. Naylor.

"4. The court instructs the jury that the burden of proof is upon the defendants to show by a preponderance of the evidence that at the time of the execution of the paper writing, offered as the will of James A. Naylor, he was of sound mind, as defined in the other instructions; a preponderance of the evidence as here used, means the greater weight of the credible testimony; and if from a consideration of all the evidence, the jury are not so satisfied, then they will find a verdict for the plaintiffs."

The above statement is deemed a sufficient compliance with section 2088, Revised Statutes 1909, but if other facts shall become pertinent in the course of the opinion they will be set out therein.

Many objections were made to the offering of evidence, and many exceptions taken to the action of the court in admitting testimony for plaintiffs, and in rejecting testimony for the defendants, but none of these objections has been carried by appellants into their briefs. We take it that they have thereby seen fit to waive all such alleged error, and since in a civil case it is not our duty to dig deeper in delving for error than appellants themselves have

Opinion.

dug in their assignments thereof, we pass these points as no error. [Buttron v. Bridell, 228 Mo. 622; Clark v. Carter, 234 Mo. 90.] In the matter of the admission and rejection of evidence, the learned trial court appears, however, to have been singularly free from fault. The case in this behalf has been well tried, and if error on this behalf had been urged, our examination of the record leads us to believe that the same could not in this case be held to be well founded.

I. Appellants complain that the court erred in refusing to instruct the jury as appellants requested, that there was no evidence of undue influence shown in this case. This was in effect tantamount to a demurrer to the evidence adduced on one of the two theories of the case urged by plaintiffs. The reliance upon this point here has necessitated a critical examination of the entire voluminous record in this case.

As a court of errors in a case of law, as a contest of a will case under our statute is, we are not required to pass upon the credibility of the witnesses and the weight of the evidence, if the evidence be substantial; these considerations are relegated to the triers of fact.

This doctrine is said in Roberts v. Bartlett, 190 Mo. l. c. 695, to be well-settled in this State. In this behalf the language of GANTT, J., in the case above cited is pertinent: ''The rule of practice is well settled in this State, that a will contest is an action at law, and this court will not reverse the judgment because the jury found against the weight of the evidence, but that this court will examine the record to see if there is any testimony to support the finding, and where there is no evidence whereon to base the verdict, the judgment will be reversed. [State ex rel. v. Guinotte, 156 Mo. l. c. 520, 521; McFadin v. Catron, 138 Mo. 227.]''

After having gone, at the expense of much time and great labor, through the record in this case, we

are not prepared to say that evidence of undue influ-
ence was absolutely lacking. The more so since it
must be borne in mind that it is a matter of extreme
difficulty always to prove the existence of undue in-
fluence by direct or positive evidence. In the very
nature of the case, if such influence be exerted, it will
be most naturally brought to bear in secret and not in
the light. That undue influence may be shown by cir-
cumstantial evidence as well as by direct evidence, we
have no doubt. This would seem to be so from the
very nature of the case, and to be almost a rule to be
deduced *ex necessitate.* On this point LAMM, J., speak-
ing for this court, in the case of Turner v. Anderson,
236 Mo. 541, used this language: ''There must be evi-
dence that such influence (i. e., undue influence) was
brought to bear, and that the effect was produced or
sprang naturally by way of inference from facts
proven. Conceding that undue influence cannot as a
rule be proven by direct and positive testimony, but
oft must need rest in inferential truth,'' etc.

Keeping this point well in mind and harking back
to the testimony in the case, we find John T. McRuer,
a lawyer by profession, for many years, as such, in the
employ of Park College, the devisee whose taking is
here chiefly attacked, was also the lawyer—''more than
lawyer''—counselor and friend of testator. For years
he had worked for this college, and had acted also as
legal adviser and business manager thereof; he had
solicited on occasions bequests for the college and ad-
mits that he ''had talked with testator a lot about
the college and was unable to say how often he had
talked about the gift of two thousand dollars.'' We
find the testator, originally, a man of strong physical
and mental powers, a hard-headed, hard-working pio-
neer farmer, upon some inducement, and for some rea-
son resting largely in shadow, so far as the evidence
shows, appointing a college student, twenty-two years
of age (who was the son of testator's life-long friend

and attorney) his executor, his trustee, and practically a guardian, for both the aged widow and the adult, and evidently intelligent, children of testator. The evidence shows that this young man had had no business experience whatever; that except for a brief service of some sort with his brother upon a farm, he knew nothing of farming; that he had never rented a farm, collected rents, or kept up repairs or looked after, or had the management in anywise of, farm land, or the farming business. Turning to the testimony to ascertain, if possible, a reason for the action of testator in setting aside his kin, and providing a trustee and practically a guardian for his widow and children, we can find nothing in the record to justify testator's acts. It is hinted, and testator is quoted as saying repeatedly, that his daughter, Mrs. Olmstead, and his son, Randall, had dissipated the property given them, but this hint and this statement are not borne out by the record. On the contrary, it is shown that Randall Naylor had at least held his own with the property theretofore given him by his father, and that Mrs. Olmstead had largely increased in value the advancement made to her, and, quoting the language of appellants, as contained in their brief, "his son, Randall, and daughter, Elfie, were both in comfortable financial circumstances at the time of his decease." The personal relations existing between this father and his children is shown to have been good; for aught that appears he was to them a loving father and they were to him a loving daughter and son. No breach of filial duty appears in any way in the record. The testator is quoted by witness John T. McRuer as saying "that his son and daughter had not cared for what he had already given them and that they would not care in effect for any other property he might give them." As we have heretofore stated, if this be a fact the record does not show it, nor trend toward its truth.

We conclude therefore that the learned trial court

was not, under the law quoted, in error in refusing to instruct the jury under all the facts and circumstances in this case and under the inference inevitably flowing therefrom, that there was no substantial evidence of undue influence, and so rule this point against appellants.

II.  Defendants complain that the court erred in refusing to instruct the jury that there was no evidence of unsoundness of mind, or in other words, lack of testamentary capacity, on the part of the testator. This alleged error is predicated upon the refusal of the court to, in effect, sustain a demurrer to the evidence adduced upon the remaining theory of the plaintiffs. As we have already stated herein, there was in evidence a sharp conflict as to whether the will was in fact executed on the date it bears, namely, May 31, 1907, or whether it was executed on July 1, 1907.   The weight of the evidence on this point is, we frankly concede, with the defendants, though in passing it may be said to be strange that Barnes, the other subscribing witness, was not called on to give evidence in a case where it seems his testimony might have set this point utterly at rest with the jury.  Mrs. Naylor, the widow of testator, testifies emphatically, that it was not executed till July 1, 1907; Barnes does not testify at all, and McRuer, by his apparent effort in the last analysis to relegate the correctness of the date to that borne by the instrument itself, is not as convincing as he might be.  The trend of the testimony on this point goes, however, largely to corroborate McRuer.  This, we take it, was, however, for the triers of fact, and not for this court sitting as a court of error.  That we might on this point have found differently, is not now a question in the case. If the will was in fact executed on July 1, 1907, then in our view, the testimony as to the lack of mental ca-

*Incapacity: Question for Jury.*

*Date of Will.*

pacity to make a will, is amply sufficient. In saying this we bear in mind the test of mental capacity in this behalf, and that rule and test is, and all that it is, has been many times well said to be, the ability at the time in the testator "to understand the ordinary affairs of life, the value and extent of his property, the number and names of the persons who are the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their capacity and necessities. He should have active memory enough to retain all these facts in his mind, without the aid of others, long enough to have his will made. Otherwise the law takes from him power to dispose of his property by will." [Turner v. Anderson, 236 Mo. l. c. 544; Crum v. Crum, 231 Mo. l. c. 638; Holton v. Cochran, 208 Mo. 314; Roberts v. Bartlett, 190 Mo. l. c. 699; Meier v. Buchter, 197 Mo. l. c. 86.] This, upon the theory that the will was not signed until July 1, 1907. This issue was in the case clear cut and well defined. The jury had a right to so find from the evidence, if they saw fit so to do. If on the other hand the will was executed on the 31st day of May, 1907, as learned counsel for plaintiffs admit in their briefs, "his mental capacity might be fairly debatable." We might go further than this and say that in our view it can scarcely be said that there was, as the testimony shows, any question about his mental capacity to make a will up to this time. But on the issues presented and on the proof adduced and under the law, we think these questions were for the triers of fact. We think that on the whole record there are issues presented upon substantial evidence sufficient to go to the jury, and that for the reasons given we ought not on this point to disturb their finding. We therefore rule this point against appellants.

III. Defendants complain of instruction num-

bered one given by the court on behalf of plaintiffs. They nowhere point out in their several briefs in what respects this instruction failed or wherein it misstates the law. Under the rule of review enunciated in Clark v. Carter, supra, we might pass it by therefore as no error. Analyzing it we find that the person making a will must be found to be of sound mind; it proceeds and defines sound mind as being "such a mind as enables a person executing a will to be capable of knowing his property, and understanding the reasonable claims of the persons who may have reasonable and natural claims on his bounty." We have set out above in subdivision two of this opinion the well-settled definition and meaning of a sound mind when weighed over against testamentary capacity. Looking at this definition and examining it side by side with the instruction, can it be said that it falls so short of the definition given as to render it erroneous? We think not. We rather think that it could have been made stronger in behalf of the plaintiff and yet have not transgressed the law. [Turner v. Anderson, supra.]

*Incapacity: Instruction.*

IV. Defendants next insist that the court erred in giving instructions numbered 2 and 4 on behalf of plaintiffs. These in their order.

By a reference to instruction numbered two it will be seen that practically the only difference between this instruction and instruction numbered one, above discussed, is that instruction numbered 2 deals with an unsoundness of mind superinduced by the excessive use of "narcotics and morphine." It will be readily seen that if the law recognizes that unsoundness of mind sufficient to affect testamentary capacity can be produced by "narcotics and morphine," then the position of defendants is not well taken. If the excessive use of such drugs will produce unsoundness of mind suffi-

*Incapacity: Narcotics.*

cient in degree to affect testamentary capacity, then the point is not well taken. As stated, otherwise this instruction differs in no material respect in its definition of testamentary capacity from the one above discussed. We are not left, however, to go outside of the record or to take judicial notice of the effects produced by the administration of codeine and morphine. The physician who administered these drugs, the widow who nursed testator, the cousin, also a physician, who saw him, as well as testator's son and daughter, all testified as to the effect actually caused by these drugs.

If in fact, the mental condition superinduced was adequate in creating an unsoundness of mind to the degree of testamentary incapacity, and if testamentary incapacity was brought about, then it does not make any difference in law, as to what compelling factor produced such unsoundness. Unsoundness of mind is unsoundness of mind in the law of will contests (present the *quantum* thereof), however produced, whether by mental disease, *senile dementia*, or stupor-producing drugs. One is but the cause, the other the effect, and with the *quantum* of the effect alone are we concerned. [Stedham v. Stedham, 32 Ala. 525; Garrison v. Blanton, 48 Tex. 299.] For, say Wharton and Stille, in their excellent treatise on Medical Jurisprudence, "mental incapacity of a testator at the time of making a will invalidates it, though it was caused by morphine or other drugs, and though they were taken for medicinal purposes." [Wharton & Stille's Med. Juris., sec. 136.] Nor where a will is made upon a death bed, shortly before death, and stupor from drugs or delirium is shown, are there presumptions arising that it was made during a lucid interval, though the existence of such intervals be shown. [Clevenger on Insanity, 487; 2 Clevenger on Insanity, 805; Elliott v. Welby, 13 Mo. App. 19.]

Instruction numbered 4, complained of by defendants in their assignments of errors, is as follows:

"The court instructs the jury that the burden of proof is upon the defendants to show by a preponderance of the evidence that at the time of the execution of the paper writing, offered as the will of James A. Naylor, he was of sound mind, as defined in the other instructions; a preponderance of the evidence as here used, means the greater weight of the credible testimony; and if from a consideration of all the evidence, the jury are not so satisfied, then they will find a verdict for the plaintiffs."

As heretofore stated, while defendants urge the giving of this instruction as error, they have not seen fit, in support of alleged error, to show us in their several briefs wherein it or either of the other instructions discussed, is erroneous. It is similar to instructions many times approved by this court on the credibility and weight of the testimony. Defendants in this case, as in all cases of will contest under our statute, have the laboring oar. The burden of proof is on them, and that is practically all this instruction says.

**Burden.**

V. Defendants contend in their fifth assignment of error that the court erred in overruling their motion in arrest of judgment. We take it that this assignment of error is bottomed upon the failure of the court to find that there was a defect of parties plaintiff. Defendants urge at much length in their briefs that the grandchildren of testator who are the children of Mrs. Olmstead and Randall B. Naylor, should have been made parties.

Turning to the will we find these grandchildren referred to, not by name, but only as "natural heirs" of Elfie Olmstead and Randall B. Naylor. The expression used in the will, viz., "natural heirs," is evidently not used in a technical sense. Clearly in the sense in which it is used in the will it has no technical meaning in law. We must

**Natural**

discover this meaning from the usual and ordinary definition of the word "natural." Under the will it was evidently used to limit the word heirs (which latter word has a well-settled technical meaning) to those heirs becoming so in "the usual and ordinary course of nature," as contradistinguished from heirs by adoption. In the case of Smith v. Pendell, 19 Conn. 107, the expression "natural heirs" was held to mean heirs of the body; likewise in the case of Miller v. Churchill, 78 N. C. 372, it was held that it simply meant children, or issue. While we do not think that these definitions are correct in the hard-and-fast sense that they are universal, and that "natural heirs" would always mean heirs of the body, yet we will not pursue this inquiry so far as the case at bar is concerned; for it is evident to us that the testator, as he used the terms in the will, used them in the sense of children of Mrs. Olmstead and Randall B. Naylor. The context of the will and his own statements shown in evidence render this clearly apparent. The testator desired, according to his many discussions of his intent in this behalf, that his property should ultimately vest

Necessary Parties.

in fee in his own blood and his grandchildren. We find the will providing that the estate devised should not vest *per stirpes* but *per capita*. Such a vesting would render any other view impracticable, if not impossible. The proof shows that Mrs. Olmstead was of about the age of thirty-five years; that she was married and already had two children; that Randall B. Naylor was aged about thirty years, that he was married and had two children. Neither the will itself nor the testimony shows the names of either of these children. With what certainty under the facts proven can we say there would never be any more grandchildren of the testator to inherit the fee? If other children be born to both Mrs. Olmstead and Randall B. Naylor, or to either of them, such afterborn child or children would take

under the will *per capita*. This the will especially provides for. It cannot be contended otherwise. If other children should be born, however numerous they might be, they would each, according to the contention of appellants, be necessary parties to this suit. If the law does not require an unborn child to be a party, then how could it require in this case the natural heirs of Mrs. Olmstead and Randall B. Naylor to be parties? The taking of the fee depends upon the contin-gency, both of the prior death of Lucy Naylor and upon the prior death of either Elfie Olmstead or Randall B. Naylor. When these deaths shall occur who can say who will be the natural heirs of Mrs. Olmstead and Randall B. Naylor? The four presently living children of the two latter persons may all be dead, and another four, or even another dozen, may then be *in esse*.

The remainder in fee is not devised to any given number, or to any named "natural heirs," i. e. children of Elfie and Randall, but to *the*, that is, *all* of the children of said Elfie and said Randall, then in being, or thereafter and hereafter to be born. Would it be seriously urged that if a child has, since the making of the will, or pending this action, been born to either of testator's children, such child will not take in fee *per capita* under the will? Yet such child has not been made and could not have been made a party to this action, though the interest of such after-born issue is in all things equal to that of the four natural heirs (at the date of the will) *in esse*.

This view of the case would seem to render unnec-essary further citation of authorities or a discussion of the question urged in the briefs of respondents, that in any event these natural heirs, whether they should have been made parties or not, are represented in the case at bar by Duncan McRuer, trustee of an active trust. In the view we take of it a mere state-ment of the facts and a reading of the will show that

the point made by defendants is not well taken, and renders unnecessary citation of authorities or a discussion of the respective attitudes in which Duncan McRuer appears in the case; that is, as to whether being trustee in the will and sued as such, he does not defend as well for his *cestui que trustent* as for himself.

Holding these views on the questions discussed and urged by appellants, we are of the opinion that the case should be affirmed, and it is so ordered.

*Brown, P. J.*, and *Walker, J.*, concur.