Lucy McGRAIL, Plaintiff-Respondent,

v.

Sadie T. SCHMITT, nee Rhoades, and Margaret Wallow, Defendants-Appellants.

No. 48389.

Supreme Court of Missouri,

Division No. 2.

May 14, 1962.

George H. Jones, Kansas City, Clarence C. Chilcott, Kansas City, for appellants.

Donald E. Raymond, Kansas City, Thomas M. Howell, Kansas City, for respondent.

PER CURIAM.

This is the second appeal of a suit to contest the will of James Robert McGrail, deceased, who bequeathed his daughter Lucy $500 in cash, and the residue of his estate (consisting of oil leases worth upwards of $33,000) to his two surviving sisters. The first amended petition to set aside the will alleged (1) undue influence on the part of the sisters, (2) general mental incapacity of testator by reason of alcoholism, and (3) an insane delusion that Lucy was not his child.

At the first trial the contestant, Lucy, submitted her case solely on the theory of insane delusion, and the jury returned a verdict setting aside the will. On the first appeal this Court reversed the judgment based upon that verdict and remanded the case, because the record did not contain sufficient evidence indicative of an unsound mind, corroborative of the evidence of delusion, to permit the jury to draw the inference that testator was insane with respect to this one subject and therefore lacked the requisite capacity to make a will. McGrail v. Rhoades, Mo.Sup., 323 S.W.2d 815. At the second trial the jury again rendered a verdict setting aside the will. The defendant sisters have appealed from the judgment rendered upon that verdict.

At the second trial the contestant abandoned the issue of monomania as an independent ground of recovery and submitted the case to the jury on the issue of general testamentary incapacity. The specific question submitted at the second trial was whether at the time of signing the paper writing testator had sufficient mind and memory to know and understand the ordinary affairs of life; that he was disposing of his property by will; the kind and extent of his property, the persons who were the natural objects of his bounty, their relation to him and his obligation to them; their deserts, with reference to their conduct and treatment of him, their capacities and necessities; that he was giving his property to the persons mentioned in the will, and that he had sufficient mind and memory to know these things without the aid of any other person. The jury was also instructed that even if testator drank to excess, to such an extent as to weaken or impair his mental faculties, yet if he was "sufficiently sober and sufficiently in possession of his mental faculties to know and understand and comprehend the fact that he was signing and publishing and declaring said paper as his will, and so as to understand and comprehend the nature and extent of his property, and who· were reasonably within the range of his bounty, and to

whom he was giving and how he was disposing of his property, without the aid of any other person," then the jury should find that he had sufficient mental capacity to make a will. Plaintiff expressly withdrew the issue of undue influence.

On this appeal appellants, proponents of the will, initially make the point that the court erred in submitting the cause to the jury because the evidence failed to disclose that testator did not have testamentary capacity, or that he suffered from an insane delusion that plaintiff was not his daughter at the time the will was executed or at any other time.

The first amended petition was not further amended at the second trial, and as indicated it alleged as an independent ground for setting aside the will that testator suffered from this insane delusion. Corroborative evidence of brutality and aversion, lacking at the first trial, was introduced at the second. Although this evidence was remote (violent shaking of the child and numerous instances of forcible twisting of her arm while muttering that she was not his child, supposedly occurring between 1916 and 1925) it was substantial corroborative evidence in support of the theory that testator had a mania on the subject of the paternity of Lucy. While contestant did not go to the jury on the issue of insane delusion as an independent ground of setting aside the will (the instructions did not mention insane delusion), the facts in connection therewith are circumstances which should be taken into consideration, along with all other relevant circumstances, in determining whether a submissible case of lack of general testamentary capacity was made. "The question of mental capacity involves whether the testator's mind was in such condition that he recognized his obligation to the objects of his bounty and their relation to him." Everly v. Everly, 297 Mo. 196, 249 S.W. 88, 91. "If one cannot recall or comprehend * * * the obligations he morally owes to, the natural objects of his bounty, he cannot be said to have testa-

mentary capacity." Ray v. Walker, 293 Mo. 447, 240 S.W. 187, 192. See Hardy v. Barbour, Mo.Sup., 304 S.W.2d 21, 35.

■ Appellants introduced evidence of the due execution of the will, and of the testamentary capacity of the testator at the time he signed it, thus shifting to contestant the burden of going forward with the evidence and producing substantial evidence of testamentary incapacity. Hardy v. Barbour, supra, 304 S.W.2d 21, and cases cited, 1. c. 25.

■. In determining whether respondent-contestant made a submissible case of general testamentary incapacity we will disregard appellants' evidence unless it aids respondent's case; accept respondent's evidence as true and give her the benefit of every inference legitimately to be drawn from it, Hardy v. Barbour, supra, 304 S.W. 2d, 1. c. 25; Norton v. Jonson, 359 Mo. 1214, 226 S.W.2d 689, 706, and determine whether the evidence, "considered most favorably to the result reached by the jury, is substantial evidence from which the jury could reasonably reach the result it did." Machens v. Machens, Mo.Sup., 263 S.W.2d 724, 734. The evidence, thus considered, follows:

At the age of about 30 years, on April 17, 1915, Bob McGrail married his first wife, Bly. Three days short of nine months later, on January 14, 1916, Lucy was born. When she was three months old Bly heard her crying in the next room. There she found Bob shaking Lucy, with a sort of a funny laugh, with his head "kind of falling back." Bob "practically had shaken the life out of the child * * * almost killed that baby." Bob did not like the child. He muttered something which Bly understood as an accusation that another man was the father of Lucy; that "it wasn't his child." Bob twisted Lucy's arm several times, and each time denied he was her father. When Lucy was six years old, after one of these incidents, Bly remonstrated "you will break your child's arm off." Bob replied, "That isn't my child."

Lucy testified Bob was never very affectionate toward her. He did not pick her up, love and play with her. Her affection came from her mother and the housekeeper, according to Lucy, although Bob's sister testified that after the divorce Lucy would visit Bob and that on these occasions Bob demonstrated love and affection, was kind to Lucy and "seemed to think a lot of her," and one of Bob's employers testified that occasionally Bob would buy Lucy sodas or candy at a drug store when she visited him at the shop. From 1918 to 1925 Bob and Bly operated a florist shop in the Scarritt Building in Kansas City. From two years after the marriage until the divorce Bob drank regularly; became intoxicated daily, "to the extent that he didn't know who he was." According to Bly, Bob was an alcoholic; an "habitual drunk." He never stopped his heavy drinking. He neglected the florist shop, could not pay the notes and finally lost the business. A divorce was granted to Bly in 1925 on the grounds of vagrancy and habitual drunkenness. There was an award of $6 per week for child support. Bob did not make these payments voluntarily stating that "it wasn't his child and he wasn't going to support her." Bob never gave Bly any reason for thinking that Lucy was not his child. At no time did he say whose child he thought Lucy was. The only basis Bob had for believing that Lucy was not his daughter was that Lucy was born three days before the expiration of nine months after the date of the marriage. Lucy looked "exactly" like Bob. Through the years Bob did not remember Lucy with gifts or money, except that Bob authorized Lucy to charge a graduation dress to him, and then complained about the cost. After the divorce Bob had fairly regular employment for several years. At work he always seemed depressed and melancholy. Finally because of Bob's drinking habits his employer discharged him. This was approximately 1931. A welfare worker who made several attempts to collect the child support payments testified that at this stage of his life Bob was untidy, unkempt and shabbily

dressed. Bob remarried in 1927 but was divorced by his second wife in 1931 for drunkenness. His employment became irregular. About 1932 Lucy took a boy friend to Bob's place of employment to introduce him and said "Dad, I would like to have you meet this young man." Bob "just turned around and walked away" without any explanation. If he recognized her on that occasion he did not admit it. Bob did odd jobs, worked in yards and on shrubbery. In 1936 he was employed temporarily to run a florist shop while the owners were on vacation. He drank and so neglected the business that the owners had to cut short their vacation, come home and take over the operation. They found "everything in quite a mess" and never did get their records straight for the period Bob had charge of the shop. About 1936 Bob left his sister's home, where he had been living, and "went to look for work." The family then lost contact with him for many years. When acquaintances would meet him on the street he would be. drinking. He. moved around from place to place. When Bob's sister in Texas died in 1945, it was necessary to get in touch with Bob in order to settle the estate. Contact with Bob was made by running a personal ad in the Kansas City Star. From the deceased sister Bob inherited a substantial estate consisting of working interests in oil leases in Texas. The two surviving sisters received interests in the deceased sister's estate equal to Bob's interest. In the late 1940's Bob went to live at the home of one of his sisters. There he remained from 1947 until 1949, at which time he moved into a downtown hotel in Kansas City. The rest of his life was devoted to spending the six hundred to eight hundred dollars a month income he received from the operation of the oil wells. On Twelfth Street Bob became a conspicuous character. In the 1920's he had dressed "like a man should," wearing dark blue suits and dressing neatly. In the later years he wore loud, gaudy clothes, and was oddly, flashily, peculiarly dressed. He would wear clothes with wide stripes "like a fellow wears in a circus . . . like a circus clown wears." It appeared he was trying to attract attention by his eccentric dress. He would wear orange hats or a little gray hat like a boy wears. He would wear shirts of different loud colors such as purple, black velvet with sequins, yellow, or pink. He would wear green or lavender pants, purple sweaters, vests with sequins, a blue and white coat with two-inch stripes, yellow, red or green vests, a ribbon or scarf tied around his waist, and sometimes he would wear cowboy boots. He would go into one bar and out of another, drinking beer and whiskey, usually highballs, day after day, many times in the morning as well as in the evening. Sometimes he would drink five or six bottles of beer over a period of an hour and a half. Often he was seen going into taverns at seven o'clock in the morning. When he went into taverns "everybody would gather around and he would buy drinks." He was one of the best hosts on the street when it came to paying his bill. He was under the influence of liquor most of the time, according to persons who encountered him frequently during this period. Bly's sister, who saw him often from 1950 until two weeks before he was killed, said that Bob was "always drunk the last years of his life." He walked in a stumbling, shuffling manner, slowly and sometimes would "jig-jag back and forth," although most witnesses said he did not stagger. One witness said "he could drink like a fish, but never staggered." He would lean against different buildings, and walk along "trying to protect himself." He was stoop-shouldered. There was an odor of liquor about his person. His face was flushed and swollen and he "fleshed up" during his latter years. His jowls were puffy and his eyes and nose were red. His tongue was purple, thick and slick-looking. His mouth was drawn to one side, with a purplish look around it. People would walk to one side, trying to avoid him. He was forbidden in one tavern because of unwanted attentions forced upon women customers. In the taverns he would "let out a

war whoop like an Indian * * * and holler kinda like a kid or something." At the bar he would "let out a loud scream and laugh for about an hour after he had let it out, just like a cowboy would holler in a western." He would put on a little dance in the bars and at Katz Drug Store. Frequently he would put on colored paint and dance around in women's clothes. Once or twice he came into Katz Drug Store wearing high-heeled, button shoes, a long pink dress, with make-up on, and a little pink lace hat. He would "kind of sing out loud, and kind of go into a little dance * * * picked up his feet * * * did a little sashay * * * and turned around * * * and our boss would have to ask him to go out." He failed to recognize friends and acquaintances when he would meet them on the street. He would "saunter along" and apparently "didn't know anyone." Sometimes when spoken to "he would keep on going; * * * go down the street talking to himself . . . just mumbling to himself." Witnesses said "you couldn't understand him at all." At times "he would just talk and blab and say nothing." He "just blabbered" . . . didn't talk with any sense. It was impossible to carry on an intelligent conversation with him. You "couldn't make anything out of his conversation." He would "kind of ramble"; talk on one thing and "skip off on another." He "talked to himself mostly." In October, 1953 Bob told one witness that he had a lot of horses which he pastured in back of the courthouse; that he was a jockey and was training and racing horses. This same witness saw him sitting on the sidewalk, picking up things, but conceded that "maybe he had lost something" or perhaps he was picking up cigarettes, which the witness saw in his hand. He would fuss with his clothes when he was drinking, and would be seen on the street "going like this with his arms [indicating], like he was killing bugs or something." He told people that he raised cattle on a ranch in Texas. An investigator for the welfare department who first knew Bob around 1929 said he didn't seem to understand about the parentage of his child, and denied the parentage, but did not give her any reason. When brought before the court for failure to pay the $6 weekly payments awarded for child support he "tried to deny that he was the father. He said she wasn't his child." Twenty-four years later, in October, 1953, after the investigator had been out of the city for several years, she encountered Bob on the street, "still intoxicated." She hardly recognized him. His dress and appearance had changed and were quite different. After identifying herself she asked him how and where Lucy was. He said "I don't know any Lucy. I don't know anything about her." In 1945 when a relative asked Bob about Lucy he said "Who is Lucy? I don't know her." A friend of Bob's, a deputy sheriff, asked Bob in 1946 or 1948 about his daughter, and Bob just turned around and walked away. After that Bob never spoke to the deputy. In 1945 Celicia Dailey encountered Bob at 31st and Main, asked him "How is Lucy?" He said "Lucy who?" Miss Dailey said "Your daughter." Bob answered "I don't know her." Sometime in the period 1946–51 Bly encountered Bob on the street. She stopped him and asked whether he could not help Lucy. "He didn't seem to know who Lucy was. I told him 'Your daughter.' He said 'I don't have a daughter.'" In June, 1953 Lucy and her aunt encountered Bob coming across Twelfth Street. Lucy called out his name and he approached them. The aunt said "Don't you want to say hello to your daughter?" Bob got quite close to them and said "She is not my daughter * * * I am not her father." His face was flushed, his body was "sort of distended, kind of like it was bloated." His eyes were bloodshot. The aunt told Lucy not to pay any attention "because he was drunk." In the fall of 1953 Bly met Bob and said "Don't you think that it is time that you were spending your money to help your daughter?" Bob said "He didn't have a daughter." At that time Bob did not seem to know Bly. On the other hand, one witness testified that she was having dinner with Bob and his sisters, on New Year's Eve, and they were talking

about their families. Bob said "he missed his family, and he said he had a daughter, but that he never had had much contact or pleasure of having the daughter with him and that he missed her and he wished his daughter acted more like a daughter to him." A friend of Bob's named Beckner talked to him three or four times about helping Lucy. The first time was around 1950 at Little Joe's Tavern on Twelfth Street. He said to Bob "Why don't you give Lucy and Bly a few dollars to help them?" Bob answered, "I am mad at Bly, and I don't have any daughter, and I wouldn't give them a dime." Bob also said he would not give Lucy a dime "as long as I am here." In the last conversation this witness had with Bob a year before Bob's death on October 31, 1955, Bob said "I will leave Lucy everything I have got when I die." Bly's sister, Mary Wedge, stopped Bob on the street a dozen times between 1951 and his death and oftentimes asked him to help Lucy. He would always refuse, saying he was not the father of Lucy. Once in 1953 Bly's sister met Bob, had a beer with him in the Brown Derby, and asked him to help Lucy. Again Bob said Lucy was not his daughter. In 1952 or 1953 at Ancona's Italian Restaurant she asked Bob to help Lucy because Lucy "was having quite a time trying to make it." Bob repeated that he was not the father of Lucy. Lucy had graduated from Kansas University and was holding a good job, but with her mother to support she was "hard up." Bly's sister was of the opinion that Bob was not of sound mind in June, 1953. The deputy sheriff gave his opinion that Bob was "nutty"; that he was not "capable of doing right thinking or using his own judgment." Bly testified she "knew" Bob was mentally incompetent, even at the time (1925) she employed a lawyer to get her divorce. A lawyer friend of Bob's testified that two or three years before the trial in May, 1960 Bob, in conversations in taverns, when loud and intoxicated, would say "I have a daughter and I am proud of her, but I haven't got a daughter." When he was drinking "it looked like it worried him," and Bob would say "I haven't got a daughter. I have got a daughter, but I haven't located her." This was at a time when her name and address were listed in the Kansas City telephone directory. Bob would mention his daughter; just say he had a daughter; refer to her, and then when he got to drinking would say "I haven't got a daughter." On two or three occasions through the years when Lucy would have a chance encounter with Bob on the street he would not speak, smile or pause. On Halloween night in 1953 Bob was struck and killed by an automobile on the streets of downtown Kansas City.

Contestants produced Dr. John Magalif, a medical doctor specializing in the field of psychiatry. Dr. Magalif testified that the effect of alcohol on the nervous system is to cause degenerative changes in the brain, hallucinations, failure of recollection, and loss of contact with reality. When alcohol is taken in quantities over a long period of time it affects the memory. The alcoholic often will not recognize people. Failure to assume responsibility is one of the factors of alcoholism. Brain tissue once degenerated will not regenerate. Because of deterioration of the brain from episodes of alcohol over a long period of time the alcoholic cannot make decisions for himself or come to a definite conclusion; and is "not capable of determining anything." The doctor had not examined or treated Bob. A lengthy hypothetical question was directed to the doctor, containing the gist of the evidence which we have summarized above, upon the basis of which it was the opinion of the doctor that "this man was of unsound mind" when he executed his purported will on August 27, 1953. His opinion was based upon Bob's behavior. He thought Bob's alcoholism was merely a shield above a basic problem; that Bob was a basic manic depressive and that he would swing to alcohol for pleasure; that he had these episodes of alcoholism over so much time that he had brain deterioration and suffered from a mental situation. He agreed that a

manic depressive might have lucid intervals when he knows what is going on, but that as an alcoholic he is "never completely lucid."

■ Considered in the light most favorable to the prevailing party the foregoing evidence was substantial and sufficient as the basis for a jury finding of lack of general testamentary capacity. The jury could find these facts: Shortly after the birth of his daughter Bob developed an aversion to Lucy arising out of an unreasoning, false and unsubstantiated notion that Lucy was not his child. He rejected her. He failed in his obligation to contribute to her support, from the time of the divorce, and when he came into his inheritance in later life he refused to contribute to her welfare, although often requested to do so by friends and relatives of Lucy who described her as needy. He became a confirmed alcoholic, taking intoxicants in such quantities over a period of 36 years that he suffered brain deterioration, with consequent loss of memory, loss of contact with reality, confusion of mind and dulling of his mental faculties, failure to recognize old friends and acquaintances, erratic and eccentric behavior, and failure to know the nature and extent of his property, as evidenced by hallucinations that he owned and was training horses and that he had cattle on a ranch in Texas. At times he acknowledged his daughter as such, but at other times he was not aware of her existence or her claim upon him, and would deny he had a daughter and deny he knew anyone named Lucy. When cognizant of her existence he would exhibit marked aversion or complete indifference to her. He carried this aversion for nearly 40 years—until his death at the age of 70 years. His rejection of her was abnormal, unnatural, without rational reason or basis in fact, and evidenced an unsound mind. Dominated by this aversion he was incapacitated "from discerning, comprehending, feeling, and appreciating the deserts of his [daughter] and his natural obligations to [her]." Evans v. Partlow, 322 Mo. 11, 16 S.W.2d 212, 217. His monomania on the subject of paternity rendered him unable to weigh and appreciate his natural obligations to Lucy. This monomania, coupled with the deterioration of his mental powers from excessive use of intoxicants to the extent that he was incapable of understanding or comprehending the nature and extent of his property, or of making a rational decision or judgment with respect to the manner in which it should be distributed, rendered him legally incompetent to make a will affecting his property.

Appellants contend that testator's contradictory statements "I have a daughter, but I haven't got a daughter" indicate he recognized he had a daughter biologically but considered he had no daughter filially because of the years of estrangement brought on by the divorce; that this shows he thought she was not a daughter to him in actions. While subject to such interpretation, testator's various references to Lucy might also be interpreted to indicate he did not know the objects of his bounty, or that his mind was in a state of confusion as to the identity, reality and existence of a daughter named Lucy, or that he knew a daughter was born to his wife during their marriage but did not consider himself the father of the child. It was for the jury to assess the real meaning of testator's declarations in this regard.

■ Appellants argue that since testator named Lucy in the will and described her therein as his daughter, and left her $500, the notion that testator had an insane delusion that plaintiff was not his daughter is dispelled. The jury however may have disbelieved the testimony of the lawyer that it was Bob who gave the lawyer directions as to how he wanted to dispose of his property, in view of the lawyer's testimony in his deposition that Ollie Rhoades, husband of one of the principal beneficiaries, accompanied Bob to the lawyer's office; that the lawyer previously had been counsel for Mr. Rhoades; and the change in the lawyer's testimony (at the trial he denied the

above statement given in his deposition, and took the new position that Mr. Rhoades was not present at the interview with Bob). Or the jury may have determined that while in fact Bob employed the lawyer to make his will and directed him to include a bequest to his daughter, Lucy, naming and recognizing her as such (which would have been consistent with his previously oft-repeated statement "I have a daughter"), nevertheless, by reason of a distorted and faulty judgment caused by the deterioration of his mental powers ("His actions were like a man who was not capable of * * * doing right thinking or using his own judgment"); dominated by his aversion and laboring under his delusion, and as an expression of his belief about Lucy's paternity ("That isn't my child" . . . "She is not my daughter" . . . "I am not her father" . . . "I haven't got a daughter"), he cut down the size of the bequest to Lucy to the comparatively small sum of $500. We do not consider that the fact, if it be a fact, that he told the draftsman of the will that he wanted to leave $500 to his "daughter, Lucy" is preclusive on the question whether Bob had an insane delusion that Lucy was not his daughter. With substantial evidence of mental incompetency, the significance of the fact that the will named Lucy and denominated her as the "daughter" of the testator, and its effect upon the contention that Bob was possessed of an insane delusion, was a matter for the jury to determine.

■ Appellants urge that the habitual use of intoxicants does not permit the inference of testamentary incapacity, where it is not shown that the testator was intoxicated at the very time he executed the will. While "The fact alone that testator was addicted to the habit of using intoxicating liquor neither raises a presumption nor permits the inference that he was mentally incompetent at the time he executed the will or lacking in testamentary capacity," Williams v. Lack, 328 Mo. 32, 40 S.W.2d 670, 673, a person is incompetent to make a will where due to the excessive use of intoxicating liquor his mind is so impaired and enfeebled as to produce unsoundness of mind sufficient in degree to affect testamentary capacity. Naylor v. McRuer, 248 Mo. 423, 154 S.W. 772, 784 (narcotics and morphine); Anno. Testamentary capacity as affected by use of intoxicating liquor or drugs, 67 A.L.R. 857, IV a, p. 870; 94 C. J.S. Wills § 25.

■ Appellants suggest "That a will appears to be unjust to the objects of [a testator's] bounty does not affect its validity." In Turner v. Anderson, 260 Mo. 1, 168 S.W. 943, 952, this Court indicated that mere inequalities in a will, standing alone, are not sufficient evidence of testamentary incapacity. "[B]ut when there is other competent and substantial proof of testamentary incapacity * * *, then the rule is that unnatural or marked inequalities in a will, based on no reasonable ground, are factors to be reckoned with on [the] issue in combination with other testimony." And see Hardy v. Barbour, supra, 304 S.W.2d, 1. c. 36; Wade v. Kirksville College of Osteopathy and Surgery, Mo.Sup., 270 S.W.2d 811; Guidicy v. Guidicy, 361 Mo. 1127, 238 S.W.2d 380; Norris v. Bristow, 358 Mo. 1177, 219 S.W.2d 367, 11 A.L.R.2d 725.

■ Appellants cite cases for the proposition that eccentricities, peculiarities, oddities of dress and habit, forgetfulness, inability to recognize old friends, intellectual weakness, failure to converse normally, confusion, talking to one's self, shifting the conversation, etc., are not inconsistent with ability to understand the ordinary affairs of life, or to comprehend the nature and extent of a testator's property and the natural objects of his bounty, and do not constitute the basis for a finding of testamentary capacity. While these manifestations might not alone be sufficient to invalidate a will on the ground of testamentary capacity, such evidence may be taken into consideration along with other facts in determining whether testator lacked general testamentary capacity. Pickett v. Cooper, 354 Mo 910, 192 S.W.2d 412, 415. In Whittlesey

v. Gerding, Mo.Sup., 246 S.W. 308, this Court said, l. c. 312, "While we are mindful of the doctrine that mere eccentricities, idiosyncrasies and oddities of personal character and conduct are not evidence of such mental disease and deterioration as will render one incapable of making a valid will, nevertheless, where the peculiarities of thought and conduct cover a variety of subjects, where the testator has suffered from any particular mania, where he has entertained delusions and hallucinations, where his thought and action have been strange and abnormal for a number of years, and where these combined circumstances tend to show mental incapacity, the question becomes one for the jury."

The court did not err in submitting the case to the jury.

 Appellants' second point is that the court erred in permitting lay witnesses to testify that the testator was of unsound mind without requiring such witnesses to first relate the facts upon which said opinion was based; that the facts upon the basis of which they gave their opinion were not inconsistent with the sanity of the testator and were insufficient as a basis for such opinion. In their brief appellants do not point out or specify the testimony of any particular witness or refer to any particular testimony claimed to have been erroneously admitted, or complain of any specific ruling of the court, or make any page reference to any particular place in the record. Such a general allegation of error is insufficient "to present anything more than the question of whether, in the testimony of lay witnesses on the issue of mental incapacity, there was substantial evidence to support the verdict." Machens v. Machens, Mo.Sup., 263 S.W.2d 724, 735.

Appellants' third point is that "the court erred in permitting the respondent to present in evidence the expert testimony of Dr. John Magalif." This point is insufficient under Supreme Court Rule 83.05(e), V.A.M.R. for the reason that it

fails to state the reason why it is contended the court was wrong in its action. From appellants' motion for a new trial and oral argument it appears to be appellants' theory that the expert opinion of a medical witness on an issue involving mental capacity is not admissible in evidence where the doctor had never seen, examined or talked to the testator in his lifetime. It is common practice to receive in evidence the opinions of expert medical witnesses as to mental soundness based upon hypothetical questions, notwithstanding the doctor had no personal contact with testator, where such questions are predicated on facts which are sufficient to raise a jury issue. Evans v. Partlow, supra; and see numerous cases collected in 12A Mo.Digest, Evidence, ⊶553(1).

The judgment is affirmed.