Gilbert DeLANEY, Howard B. Partney, Mrs. Beulah Feance (Nee Partney), Mrs. Lorraine Kerner (Nee Partney), Mrs. Marjorie Petry (Nee Brinner), William A. Brinner, Mrs. Evelyn Bagby (Nee Partney), Mrs. Lucille Hickey (Nee Partney), Wesley A. DeLaney, Bernice Steckman, George F. Partney a/k/a Fritz Partney, and Ernest F. Partney, Appellants,

v.

June (Fay) COY and Ernest A. Partney, Respondents.

No. 51652.

Supreme Court of Missouri,

Division No. 2.

Nov. 14, 1966.

Thurman, Nixon, Smith & Howald, Jeremiah Nixon, Hillsboro, for appellants.

Brunson Hollingsworth, Anderson, Hollingsworth, Anderson, & Brooking, Hillsboro, for respondent.

PRITCHARD, Commissioner.

Upon motion grounded upon the insufficiency of the evidence, the trial court directed a verdict against contestants of the last will and testament of Katie T. Bengel, deceased. The proponent of the will, respondent here, is June (Fay) Coy, the sole devisee. She was alleged to have exercised undue influence over Katie and by requests and entreaties induced and compelled her to execute the will. It was also alleged that Katie did not have the requisite mental capacity to execute the will.

The petition alleges and the answer admits that Katie died on or about June 26, 1963, owning real estate and personal property devised by her will. We thus have appellate jurisdiction of this case. Mo.Const.1945, Art. V, § 3, V.A.M.S.

The issue with which we are concerned is that of the sufficiency of the evidence to make a jury question on the mental capacity of Katie to make her will (which is undated, but which the evidence of respondents shows was executed by her in the presence of two attesting witnesses on June 5, 1963).

Proponent introduced evidence tending to show that Katie validly executed her will on June 5, 1963. About two weeks prior to that date attorney Herbert K. Moss (now Circuit Judge of the 23rd Judicial Circuit of Missouri) came out to Katie's home and conferred with her for about an hour about her will. Katie had contacted Judge Moss through his mother, Mrs. Julia Moss. At that time, no one was present in the room with Katie and Judge Moss. She first told him she wanted to make a deed with June's (Fay's) name on it, but at his suggestion she made the will. It was Judge Moss' opinion, based upon his conferences with Katie, and attorney Hugh Anderson's opinion (he with Judge Moss was an attesting witness to the will) that Katie was of sound mind when she executed same.

Contestants in their burden of proof to show want of Katie's mental capacity, Hardy v. Barbour, Mo., 304 S.W.2d 21, 25 [1], first produced as a witness Gilbert DeLaney, a contestant and the father of June (Fay) Coy. In the last five years before Katie's death, Gilbert visited her every Sunday, sometimes on Saturday and twice a week, and he would repair things for her. During that time, Katie's health was "very poorly" in his estimation. He testified, "Well, you talk about things and she would forget." She would lie on a cot in the dining room almost the entire day, and almost every time he went by she would have to get up and unlock the door. Before March, 1962, Katie had sickness—she claimed she ate "too much sweet stuff." Thereafter, Katie was never the same—"she just went down." During March and April, 1963, her mental condition was bad in his estimation—he could just see her going down. On March 30, 1963, Katie sent Gilbert a birthday card, and about four days later she sent him another, forgetting that she had sent him the first one. On June 2, 1963, Gilbert saw Katie at a homecoming at a little country church at Ware, Missouri. On that day she was walking around, but later got sick and told June, "We will have to go home. We can't stay for the after-

noon service." Gilbert went back to Katie's house that day and found her lying in bed. She said, "I feel awful bad." He saw her next on June 7, 1963, after she had her stroke. She then lisped in her speech, but recognized everyone around her that day and for a few days.

It was Gilbert's opinion that Katie did not have enough mental capacity to transact business affairs on either June 2, or June 7, 1963.

On June 14, 1963, Gilbert asked June if Katie had made a will and June said that as far as she knew there was no will. He asked her again on June 21 if Katie had a will, and June then said, "Yes, Daddy, there's a will." "Mr. Moss come out," and "Mrs. Bengel sure made a good choice." As to who had Mr. Moss come out, June said, "We called him." "We called Mr. Moss."

On cross-examination, Gilbert testified that the fact that Katie sent him two birthday cards indicated to him that she was forgetful. She forgot also that he wired her house for her, and she didn't remember that he had closed an archway for her between the kitchen and dining room of her house. She had forgotten a lot of things, but remembered some things which had happened when he was a boy. Katie was eighty years old when she died. She always recognized him and always knew that she loved him, and she was grateful to him. She was a hardy, strong-minded woman at one time, was very close, and never asked him for advice on business matters. For 100 acres she sold he had offered her $7,300, but she received $14,000 for it after she paid her taxes thereon. He didn't know if there was anything mentally wrong with Katie, and he was not paying any attention to the part of anyone influencing her to do the things she did. He had no knowledge of anyone coaxing or persuading Katie to make her will. She was closemouthed about business—in money, and she never confided in him.

Parts of June (Fay) Coy's deposition were read into evidence. She testified therein that for a year before her death Katie was not in perfect health. Her mind was fine—she was keen and walking around. She lived by herself and June did not have to tend her in any way. In March, 1962, Katie had a cold and bladder trouble, and June noticed she was slower in getting up from a rocker. She kind of leaned, but didn't act like she was going to fall—she could walk. She went to a Dr. Pierce later and had a stone removed without surgery from her vagina. In the summer she went again to Dr. Pierce who found her blood pressure high for which he gave her pills from his office. Katie visited Dr. Pierce about once a month after that—six or seven visits for high blood pressure. On June 2, 1963, Katie went to the Ware, Missouri, homecoming, and on the following Friday, June 7, she had a stroke. June then found her in bed, the window of the bedroom partially open, through which June sent her daughter to unlock the front door. At that time, Katie "kind of blew her words." June cleaned Katie and later called a doctor who came out the next day. June was with her from June 7 until she died, during which time Katie never talked about money problems or her likes and dislikes of various people. After the stroke, about June 8, Katie signed two checks—one for interest on the bank account, the other her pension check. Both were signed at June's request, when Joyce Young (a neighbor) was present and helped to set Katie up. Katie then held her pen and wrote her name herself—no one helped her.

Ernest A. Partney, eighty years old, was Katie's only surviving brother. He visited Katie often. June called him about Katie's stroke on June 7, and he went to see Katie on June 8. At that time, he testified, in his opinion Katie was not capable of transacting business affairs ("She was very sick, she had a stroke"). Mr. Partney saw Katie several times thereafter, and her condition continued bad. So also was the testimony of Katie's niece, Evelyn Bagby, that when

she saw Katie on June 9, 1963, she was not capable of transacting ordinary business affairs.

■ We deem that these opinions (all unobjected to) that Katie lacked mental capacity to transact business affairs were not sufficient to make a submissible issue of whether Katie lacked the mental capacity to make a testamentary disposition of her property either on June 5, 1963 (the date which respondents' evidence showed was the date of execution of the will) or any date thereafter. There was no evidence tending to show, or from which the jury could have found, that at *any* time Katie did not possess an understanding of the nature and extent of her property, those persons who were the natural objects of her bounty and the person mentioned in her will. Hardy v. Barbour, Mo., 304 S.W.2d 21; Rose v. Rose, Mo., 249 S.W. 605; Shearrer v. Shearrer, Mo.App., 259 S.W.2d 705; Adams v. Simpson, 358 Mo. 168, 213 S.W.2d 908. It is true, as the evidence shows, that Katie suffered a disabling stroke on June 7, 1963. If the will were executed thereafter, as contestants claim was an issue from the statement of June to her father on June 14 that there was no will that she knew of and that on June 21 there was a will, yet there is no evidence, other than the conclusions that Katie lacked the mental capacity to transact business affairs, that she was in such mental derangement or deterioration (caused by the stroke or otherwise) that she could not make a will, under the above cases on issues of testamentary capacity. In the case of Crossan v. Crossan, 169 Mo. 631, 70 S.W. 136, 139, it was held proper for the trial court to strike from an instruction the words, "to control and conduct her ordinary business affairs" on the proposition that "a man may be capable of making a will, and yet incapable of making a contract or managing his estate." There was no fact related in the testimony that Katie did not know the nature and extent of her property, the objects of her bounty, or that she did not know what she was doing at *whatever* time she made her will.

■ We turn to the issue of undue influence alleged to have been exerted over Katie by June in the execution of the will. There is no evidence that June procured the lawyer to draw the will. There is no evidence that June was present and participated in any way in the drafting of the will, nor is there any evidence by inference or otherwise that she even importuned or persuaded Katie, or was in any way actively concerned in the execution of the will. June did not assist or supervise Katie in any way in her business dealings and affairs so as to create a confidential relationship between the two. As far as this record shows, Katie was a strong-minded, close person who discussed her business with no one.

Contestants here point to facts showing what they call "peculiar circumstances" relating to June's activity in the execution of this will on the issue of her undue influence over testatrix (bracketed comments ours): (1) She was present at the time of the first visit by Judge Moss. [The evidence shows that June was outside Katie's house, and not present in the room with Katie and Judge Moss when they had discussions relating to the disposition of Katie's property.] (2) Words spoken by Katie to June after the execution: "Well, it is all taken care of." [This shows nothing except Katie's own volition in making her will.] (3) She was present when the will was signed and she knew a will was being drawn. [This, as in the initial conference, shows nothing about any undue activity on June's part.] (4) Her aunt immediately told her to tell no one that the will was made. [This was the voice of a hardy, closemouthed woman, not that of June's, so as to create any adverse inference against her.] (5) When the attorneys arrived she (June) knew they were coming and she was the only one present, other than testratrix, when they came and she let them in the house. [Again, this shows no

undue influence. June was not present in the room under this evidence, when the will was signed, and evidence showing she let the attorneys in the house shows nothing to establish undue influence.] (6) Immediately after the will was executed the deceased physically delivered the will to defendant Coy and then defendant put it in a box. [The evidence shows that Katie sealed the envelope, handed it to June who put it in *Katie's* metal box under her dresser. There is no inference from this evidence that June took charge of the will.] (7) Thereafter, June concealed the existence of the will, she even lied about it under her own admission. [Katie told June to tell no one of the will. But even if she lied about it to her father on June 14, 1963, that establishes no element of undue influence under this record.] (8) After the execution of the will defendant was with the deceased almost every minute, day and night, until the death on June 26. [There is no evidence that the constant care given by June to Katie after her stroke was done for the purpose of keeping a domination over her. The record shows that other persons visited Katie freely during this time.] (9) After deceased was hopelessly ill and unconscious, on June 21, five days before the death, defendant Coy admitted in two statements that "we" called the attorney. This is an admission of participation. [Taken as true, as we must in this review, this fact, standing alone, does not establish undue influence—the substitution of June's will for that of Katie. It does not show that the act of procuring an attorney to draft the will was solely the idea of June. Compare Buckner v. Tuggle, infra.]

Under this whole record, we rule the evidence to be insufficient to establish testatrix' mental incapacity under cases above cited, or that June exercised any undue influence over testatrix in the execution of her will. Snell v. Seek, 363 Mo. 225, 250 S.W.2d 336, 342; Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135; Beckmann v. Beckmann, 331 Mo. 133, 52 S.W.2d 818;

Buckner v. Tuggle, 356 Mo. 718, 203 S.W.2d 449, 452 [1–3].

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.