George L. HOUGHTON, Willie D. Houghton, Deana Houghton Rancour, Naida Houghton Hunt, Hertha Houghton Tranter and Essel Houghton Beresford, Respondents,

v.

Frederick JONES, Jr., Executor of the Estate of Jack Rector, Deceased, Frederick Jones, Jr., Wanda Lee Koeppe, Church of the United Brethren, New Cambria, Missouri, Charles Westen, Executor of the Estate of Theodore Houghton, deceased, James (Jim) Rector, and Mrs. Robert (Bob) Pippin, Appellants.

No. 52234.

Supreme Court of Missouri, Division No. 2.

July 10, 1967.

Rehearing Denied Sept. 11, 1967.

Edwin Yagel, Brookfield, James J. Wheeler, Keytesville, Robert DeVoy, Brookfield, for respondents.

Harry L. Porter, Marceline, for appellants.

HENRY J. WESTHUES, Special Commissioner.

This is an action to contest the last will and testament of Theodore M. Houghton, deceased, who died on September 18, 1959. The petition was filed in the Circuit Court of Linn County, Missouri, on the 25th day of May, 1960. The case was continued from time to time and, on August 4, 1965, on application of the respondents, the case was transferred to the Circuit Court of Chariton County, Missouri. A trial in January 1966 resulted in a jury verdict finding that the paper writing was not the last will and testament of Theodore M. Houghton. A judgment was entered and appellants appealed. This court has appellate jurisdiction on the grounds that Houghton died leaving real estate and, further, that the value of the estate far exceeds $15,000.

The issue submitted to the jury was whether the testator, Theodore M. Houghton, on August 1, 1958, the day the alleged will was executed, was of sound and disposing mind.

In this opinion we shall refer to respondents as plaintiffs and to appellants as defendants.

The beneficiaries of the alleged will of Theodore M. Houghton were the Church of the United Brethren of New Cambria, Missouri, which was given $100, and Jack Rector, to whom all the remainder of the estate was devised. The estate consisted of about 400 acres of land and personal property, all of the value of more than $40,000.

Jack Rector died in 1959 before this suit was filed. He left a will and the beneficiaries named therein were made defendants in this case.

The plaintiffs in the present suit are George L. Houghton, Willie D. Houghton, Deana Houghton Rancour, Naida Houghton Hunt, Hertha Houghton Tranter, and Essel Houghton Beresford, nephews and nieces of the testator and his sole and only heirs.

The defendants are Frederick Jones, Jr., executor of the estate of Jack Rector, deceased, who also was named as a beneficiary in the will of Jack Rector, Wanda Lee Koeppe, a niece of Jack Rector, deceased, and a beneficiary in his will, the Church of the United Brethren, New Cambria, Missouri, a legatee in the alleged will of Theodore M. Houghton, Charles Westen, executor of the estate of Theodore Houghton, and James (Jim) Rector and Mrs. Robert (Bob) Pippin, brother and sister of Jack Rector, deceased. The last two named, being the brother and sister of Jack Rector, claim no interest in the present case. The other defendants filed an answer denying the allegations of plaintiffs' petition concerning the mental incompetency of Theodore M. Houghton to execute a will.

Defendants briefed eight points. However, in the brief they state correctly that the first seven relate to the question of whether defendants were entitled to a directed verdict on the theory that the evidence was insufficient to justify submitting the question of mental incapacity to a jury. The last point briefed pertains to the giving of an instruction on the burden of proof. Defendants claim that "the burden of proof on the issue of testamentary incapacity is on plaintiffs." The questioned instruction placed the burden on the defendants.

The facts, in so far as material for a disposition of the issue as shown by the record, are: At the time the will was executed the testator, Theodore M. Houghton was 86 years of age. He had lived with his brothers on the land here in question near New Cambria, Missouri. Theodore never married and all of his brothers and sisters predeceased him. A number of his relatives, nephews and nieces, lived nearby. The evidence was that they visited their uncle frequently, cultivated some of his land, and were on friendly terms. Theodore became ill and was taken to St. Francis Hospital at Marceline, Missouri, for a short period in 1952. In December 1953, he again was taken to St. Francis Hospital. On December 19, 1953. Theodore, by deed, conveyed the 400 acres in question to Dr. C. O. West and his wife, Alta. Dr. West had been treating Theodore for his illness. In December 1954 Theodore filed a suit to set aside that deed on the grounds of mental incapacity and undue influence. The trial court set the deed aside on both grounds. That decree was affirmed by this court. See Houghton v. West, Mo., 305 S.W.2d 407. Dr. Robert W. Smith, one of the doctors who treated Theodore at the hospital, testified for the plaintiff in that case concerning the mental incapacity of Houghton. Jack Rector testified for the plaintiff as to Houghton's mental incapacity and also as to the undue influence charged against Dr. West. Dr. West died prior to the time the case was filed. His widow was named as the defendant. Harry L. Porter was attorney for plaintiff Houghton in that case. Theodore M. Houghton was a patient in the hospital from 1953 until his death. He was released on only a few occasions and then only for a short time. Dr. Smith treated Houghton during all of those years. Jack Rector, who testified in the first case, is the same person who was the principal beneficiary in the will of August 1, 1958, which is the subject of this lawsuit. Dr. Smith, who testified for Houghton in the first case, testified for the defendants in the present case. Mr. Porter, the attorney for Houghton in the first case, represents the defendants in this case.

In their petition plaintiffs asked that the will be set aside on the grounds of mental incapacity and undue influence. However, as above noted, the case was submitted to the jury on the issue of mental incapacity only. We shall now examine the record and determine whether the evidence was sufficient to submit the question to the jury.

At the trial the defendants, proponents of the will, called as witnesses Betty Burstert and Marguerite Slater who testified that they signed the alleged will of Theodore Houghton and that, in their opinions, he was of sound mind.

The plaintiffs-contestants then introduced their evidence which supports the following statement of facts.

Prior to 1953, Theodore Houghton and plaintiffs in this case were on friendly terms. They visited each other from time to time and had meals together. Often food was taken by plaintiffs to "Uncle Theodore." One of the nephews cultivated a portion of Theodore's land. While he was preparing the soil for the next year he was told by Jack Rector to stop, that he, Rector, was taking care of Theodore's business. Jack Rector began doing some work for Houghton about 1950 and continued to look after him and his business to a great extent from that time to the day of Houghton's death. Rector made statements that

he was being paid for his work and wanted others to stay away. A paper writing was produced dated December 17, 1952, which read:

"To Whom It May Concern:

"This is to certify that I want Jack Rector to attend to all my Estate and not allow anyone to move or dispose any of my belongings. If anyone does I have ordered him to swear out papers and have them arrested.

"Respectfully,

"T. M. Houghton."

There was evidence that the signature was that of Houghton but the remainder of the writing was not.

One witness testified that in 1956 he, Jack Rector, and others went to church together; that on the way home Rector told him that he had taken over the management of Houghton's place; that he had had an encounter with Lloyd Bivins over it and that he would shoot Bivins if he caught him on the premises; and that Jack Rector told the witness that he was getting $1.50 an hour for his work.

Kenneth J. Munn, an auctioneer by trade and the operator of a sale barn, testified that in July 1955 Jack Rector arranged for a public sale of Theodore Houghton's machinery, household goods, and some antiques; that the proceeds of the sale were paid to Jack Rector; that in November 1957 he sold some cattle at public auction belonging to Houghton; that Rector wanted the money but that he, Munn, deposited it to Houghton's account in a bank. This witness testified that he saw Houghton at the hospital a number of times in 1957 and 1958; that in 1957 Houghton did not know him and that in 1958 his condition was worse; that in 1958 Houghton was unable to transact business.

There was evidence that on the day of the sale in 1955 Theodore Houghton was present and asked who was having the sale; that he, Houghton, did not want the sale; that shortly before the sale he gave a few articles to one of the plaintiffs and stated that he wished the articles to remain in the family.

A number of plaintiffs and others who were not interested parties testified that Houghton grew gradually worse as the years passed and that on many occasions he did not know them when they visited him at the hospital.

Jonathan Biswell, who lived near Theodore Houghton, testified that he had known Houghton for about 18 years and visited with him from time to time; that Theodore always called him "Jonathan"; that after Theodore was taken to the hospital he visited him now and then all through the years from 1953 to 1959; that in his opinion Theodore "was a pretty sick man" and never improved; that when he would visit him he never called him by name and often did not know him; that Houghton would ask "Who are you?"; that in his opinion Houghton was unable to transact any business during 1958 and was incompetent.

Now we shall review the medical evidence offered by plaintiffs and such evidence of the defendants which, in our opinion, aids plaintiffs' theory.

Dr. John R. Dixon testified for plaintiffs. His qualification as an expert was not questioned. He was a graduate of Kansas University and for a time was an instructor in pathology in Cook County Hospital in Chicago, Illinois, and had had training in psychiatry in San Antonio, Texas. He had practiced medicine in Marceline, Missouri, from 1953 to the time of trial. He testified that he visited patients at the St. Francis Hospital during all of those years. He stated he knew Theodore Houghton and had seen him frequently; that Houghton was not a patient of his but that he had visited with him quite often. He testified that Houghton had a peculiar step, referred to in French literature as a "marche a petits pas which means a short marching step" which "has been associated

with advanced degeneration of the brain commonly referred to as encephalomalacia"; that a damaged brain does not regenerate but gradually worsens. The doctor examined the hospital record which was in evidence and testified that in his opinion, based on his observation of Theodore Houghton through the years and on the hospital records, Houghton, on August 1, 1958, did not have the mental capacity to comprehend the act of making a will.

Dr. George Gary testified for the defendants. He treated Houghton in connection with Dr. Robert M. Smith. These two treated Houghton during all the years that Houghton was in the hospital. Dr. Gary testified that in his opinion Houghton was of sound mind on August 1, 1958. Note his evidence. "During theses times when Theodore Houghton was well controlled and didn't have any minor afflictions of any kind, well, he was very lucid and he would conduct his business, you know, as he usually did and would be very aware of what was going on, and during this time, well, he apparently had no difficulty with his blood sugar and his mental capacity were relatively normal. He had no difficulty during the time when his blood sugar wasn't swinging wildly to carry on his business as he usually did." On cross-examination Dr. Gary testified as follows:

"Q Did you ever diagnose Mr. Houghton as suffering from encephalomalacia or softening of the brain? A I don't know.

"Q Well, did you ever diagnose and come to your conclusion that he was suffering from that? A Surely everybody has some and I don't know if he—

"Q (Interrupting) How does that affect the mental process, Doctor? A Well, it lessens their acuity, of course, and makes them more or less poor in their judgment.

"Q It certainly does affect the mental process, doesn't it, doctor? A Yes.

"Q Is that ever repaired? A Well, no.

"Q Once the brain is damaged it does not repair itself, does it, Doctor? A Well, from encephalomalacia, from the arteriosclerosis.

"Q Well, what is encephalomalacia? A Well, it's a, it's actually a deterioration of the grey matter due to poor blood supply.

"Q And that is a frequent condition when a patient or a person suffering from arteriosclerosis, is it not? A Well, I think it occurs in everybody.

"Q It occurs to everybody? A Yes; it's more pronounced in some.

"Q Once that has occurred is there any cure or regenerative process? A No; no, there isn't.

"Q Would you say that Mr. Theodore M. Houghton had brain damage in 1954? A I think so.

"Q Would you say he was suffering from arteriosclerosis in 1954? A Yes.

"Q And is that a progressive thing, Doctor? A Yes, it is.

"Q It gets worse in each passing year? A Yes."

Dr. Robert M. Smith, who testified for the defendants, treated Houghton from the day he entered the hospital to the day of his death. The doctor stated that in his opinion Houghton on August 1, 1958, was mentally competent to execute a will; that Houghton at times was incompetent, especially when his diabetes was out of control; that when the diabetes was brought under control by medication he would return to normal. It may be stated here that the hospital records disclosed that Hougton was treated for his diabetes condition during the month of July 1958, and that he had an infection on July 26, six days before the will was executed. Dr. Smith testified that in December, 1953, Houghton was not competent to make a deed; that at that time he was suffering from diabetes, arthritis, arteriosclerosis, and, to a mild degree, encephalomalacia. On cross-examination, Dr. Smith testified that in 1953 it was determined that Houghton had

considerable arteriosclerosis and also softening of the brain. He admitted that in the trial of Houghton v. West, supra, he was asked the following question, to which he made the following answer:

"Question. With respect to this arteriosclerosis will you tell us what that is, what it means, Doctor? 'Answer. Arteriosclerosis is simply hardening of the arteries. He has a generalized type of arteriosclerosis with diabetes which makes it considerable worse and this involves the arteries over his whole body as well as in his brain.' "

Dr. Smith testified that arteriosclerosis and encephalomalacia, or softening of the brain, were progressive in nature and could not be any other way.

Defendants introduced evidence that on a number of occasions Houghton made statements that he did not want any of his property to go to his nephews and nieces. They also introduced three prior wills executed by Mr. Houghton to show that he did not wish any of his relatives to have his property. Not one of the plaintiffs was mentioned in these wills. However, a deed executed in 1953 was set aside on the grounds that Houghton was of unsound mind and that it was the result of undue influence. A will, executed in 1955, contained the following clause:

"SECOND: I direct that my Administrator shall have my name and other appropriate engraving accomplished on the Houghton family monument in the New Cambria cemetery and that my Administrator further purchase an appropriately engraved head stone or foot stone to be placed upon my grave in such family plot."

The evidence showed that prior to 1948 the name of Loren Houghton, a brother of Theodore, had been engraved on a headstone with the year of his birth, 1874, and the year of his death, 1940. Also engraved on the headstone was the name of the testator, Theodore M. Houghton, and the year

of his birth, 1872. The date of death was left blank.

Defendants' witness, Dr. Gary, testified that a person suffering from arteriosclerosis may turn against his relatives and friends. We may state here that in this case a jury could well find as a fact that Jack Rector had been a material accomplice with Houghton's arteriosclerosis to turn him against his relatives.

Jack Rector was a witness in the trial of Houghton v. West, supra. His evidence at that trial was introduced as evidence in the present case. Rector testified at that trial that he often purchased feed supplies from a farmers' exchange to feed Houghton's stock and that he would take the check to Houghton and he would sign it. Rector was asked: "Question. He knew what you were about, he knew when you would bring the check over? Answer. I don't know whether he did lots of times or not. I would have to put hand on the line. Question. But he would sign it? Answer. I would tell him to sign it and he would sign it."

In the case now before us, Mrs. George Houghton testified that she had a conversation with Rector about some matters pertaining to Theodore Houghton's affairs and Jack Rector said, "I can talk Theodore into anything." This evidence may be more material on the issue of undue influence but it also tends to show a weakened mind on the part of Houghton and that he was not able to manage his own affairs.

The evidence pertaining to the execution of the will was, in our opinion, far from impressive. Betty Burstert and Marguerite Slater, practical nurses at the hospital, witnessed the will. Betty Burstert was the first to testify at the trial. Note her evidence as to being requested to be a witness to the will and the information given by Houghton when the will was signed. Direct examination by Mr. Porter:

"Q Will you state the circumstances which led to the execution of that will please? A Well, I was on duty and you

come up to me and wanted me to witness it in his room.

"Q Anyone else? A Marguerite Slater.

"Q And who is Marguerite Slater? A She is a practical nurse at the hospital.

"Q Was she employed there at that time? A Yes, sir, she was.

"Q All right, will you tell the Court and Jury what happened at the time this will was executed? A Well, what do you—

"Q—(Interrupting) State what occurred? A Well, you asked us to come in and witness it, and you read the will, and then he signed it and we witnessed it. And you asked us to stay and you asked him about the property and his relatives, I don't recall just what was said but—

"MR. YAGEL (Interrupting): Object to that, conclusion of the witness and move it be striken; she's testifying to a conversation not—

"THE COURT: I didn't get the last what you objected to there, I couldn't hear you—

"MR. YAGEL: (Interrupting): Conclusion of the witness.

"THE COURT: Overruled.

"Q (By Mr. Porter) Was the will read to Mr. Houghton? A Yes.

"Q Do you know whether or not he stated that that was what he wanted in his will?

"MR. WHEELER: Object to the leading. THE COURT: Sustained.

"Q (By Mr. Porter) Did anyone inquire of Mr. Houghton whether that will was the way he wanted it?

"MR. WHEELER: Object to the leading. THE COURT: Sustained.

"Q (By Mr. Porter) Did I make any inquiry of Mr. Houghton after I read the will to him? A Yes, you did.

"Q. What was that inquiry? A Well, you asked him about his relatives and about his property that he had.

"Q Was any request made that you sign as his witness?

"MR. YAGEL: Object to the leading, Your Honor.

"A Yes.

"THE COURT: Overruled.

"Q (By Mr. Porter) You may answer that. A Yes, he asked—you asked him if he wanted us to witness it and he said yes."

On cross-examination this witness was asked:

"BY MR. YAGEL:

"Q Mrs. Burstert, did Theodore Houghton ever tell you who his relatives were? A No.

"Q Did you ever know he had any? A Yes, I knew he had some.

"Q On this day, August the 1st, did he say who they were? A No."

It was shown that all through the years from 1953 to the day of his death Mr. Houghton spent most of his time in bed. He was unable to walk without help. He usually used a walker but sometimes someone would help him.

■ It is obvious from the facts stated that the evidence was sufficient to submit the question of the mental incapacity of Houghton to a jury. Defendants cited cases such as Delaney v. Coy, Mo., 407 S.W.2d 902, and Nute v. Fry, 341 Mo. 1138, 111 S.W.2d 84, where this court held the evidence insufficient to submit the case to a jury. However, in the case before us the evidence concerning the mental incompetency is much stronger than in the cases cited by defendants. We need not restate the evidence. But in the case before us, in addition to the evidence of nonmedical witnesses as to the condition of Houghton, we have the evidence of a medical doctor, well qualified, who observed the

testator over a period of years and who examined the hospital records. It was his opinion that Houghton was not competent to execute a will on August 1, 1958. This doctor's opinion was supported by much of the evidence given by the doctors who treated Houghton. We rule the trial court did not err in submitting the case to the jury. McGrail v. Schmitt, Mo., 357 S.W.2d 111, l.c. 120 [10, 11], 9 A.L.R.3d 1; Sturm v. Routh, Mo., 373 S.W.2d 922, l.c. 928 [27], 929, 930 [4, 5]; 95 C.J.S. Wills § 462b(3), p. 428, § 462b(4), pp. 429, 430.

 As to the burden-of-proof instruction, we rule that the trial court did not err. The established rule in Missouri is that in the trial of a will contest where the issue of mental incompetency is at issue, the proponents of the will are required to show that at the time the will was executed the testator was of sound mind. The contestants, to make a case for a jury, are then required to come forward and introduce substantial evidence to prove that the testator did not have the mental capacity to make a will. The proponents may then present further evidence of competency. That procedure was followed in this case.

As to the burden of proof in such a case, it remains with the proponents of the will. See 94 C.J.S. Wills § 31b(2), p. 737, notes 40, 41, 42; Foster v. Norman, 346 Mo. 850, 143 S.W.2d 248; Weaver v. Allison, 340 Mo. 815, 102 S.W.2d 884, l.c. 885 [3], 110 A.L.R. 672.

Defendants cited cases such as Delaney v. Coy, supra, 407 S.W.2d 902, and McGrail v. Schmitt, supra, 357 S.W.2d 111, as authority that the burden of proof on this issue of mental incapacity is on the contestants. An examination of those cases shows that the ruling there made is that after the proponents have made a showing of due execution of a will, then to make a case for a jury the contestants have the burden to introduce substantial evidence that the testator was of unsound mind. The cases do not rule the question of a burden-of-proof instruction.

Plaintiffs filed a motion and a supplemental motion to dismiss the appeal of defendants on the ground that defendants' points relied on are mere abstracts of law and do not preserve any question for review. A further ground alleged is that defendants' statement fails to contain a concise statement of facts to the questions presented for determination. Since we have written the case on the merits, it will not be necessary to consider the motions and we overrule them without comment.

The judgment of the trial court is hereby affirmed.

PER CURIAM:

The foregoing opinion by Henry J. Westhues, Special Commissioner, is adopted as the opinion of the court.

All of the Judges concur.